[No. E009239. Fourth Dist., Div. Two. Mar. 2, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID JAMES FARROW et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication except for that portion of the Discussion which extends from (and including) part I, subpart B, through part V, subpart D.

**COUNSEL**

Randall B. Bookout, Glenn R. Salter, Corrine S. Shulman, Mark D. Greenberg and Michael R. Totaro, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and John T. Swan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TIMLIN, J.**—The matter before us consists of a separate appeal by each of four criminal defendants who were tried together. By name, the four defendants are David James Farrow (David), Douglas Gregory Farrow (Douglas), David Wayne Jackson (Jackson) and Keith Benjamin Fletcher (Fletcher).[1] In general terms, all four defendants were charged by a three-count information that set forth allegations of first degree residential robbery, residential burglary and assault with a deadly weapon or by means of force likely to produce great bodily injury. The information also set forth numerous sentence enhancement allegations as against each of the defendants. The defendants appeal from the judgments entered below upon the jury guilty verdicts and sentence enhancement allegation true findings that were returned.

On appeal, the defendants have raised the following contentions:[2] (1) The trial court prejudicially erred in failing to conduct further proceedings to inquire into the possibility of juror misconduct, which possibility was revealed for the first time in connection with David's motion for a new trial,

---

[1] We refer to the four defendants by this mixture of first and last names not out of any sense of undue familiarity or lack of respect, but out of a need to adopt a method of easily and efficiently referring to each of the defendants without confusing the two "Farrows" and/or the two "Davids."

[2] We refer collectively to "the defendants" because each of the defendants has joined in the appellate arguments put forth by the others. Where it is important to note that a particular appellate issue or argument relates only to certain defendants, we will so note that fact and our discussion of that issue/argument will be limited accordingly. Otherwise, we will simply address the issues raised on appeal without making specific reference to the defendant who has "pulled the laboring oar" in arguing that particular issue.

and further erred in failing to grant the other defendants' request for a continuance of the hearing on the motion for a new trial to enable them to further investigate the purported juror misconduct for the purpose of determining whether newly discovered evidence would be an additional meritorious ground for the motion; (2) three instances of prejudicial prosecutorial misconduct occurred during the prosecuting attorney's closing argument; (3) the trial court prejudicially erred in failing to give requested jury instructions concerning vandalism and trespass as lesser related offenses of the burglary charge; (4) the trial court prejudicially erred in failing to instruct sua sponte on the defense theory of "claim of right"; (5) the trial court erred in using the appellate "substantial evidence" standard in ruling on one of the bases for the motion for a new trial—an asserted insufficiency of the evidence to support a conviction on count III; (6) the trial court erred under Penal Code section 654 in imposing sentence on both the burglary count and the assault count and not staying execution of the sentences imposed on the assault count; (7) the convictions of first degree burglary and first degree robbery must be modified to convictions in the second degree inasmuch as the jury was not instructed as to the degrees of those crimes or that it was its (the jury's) duty to fix the degrees of those crimes (as a consequence of which the jury did not expressly fix the degrees of the same in the first degree); (8) the trial court erred by failing to state reasons (as to two of the defendants) for imposing consecutive sentences with respect to the assault convictions; (9) the imposition of $5,000 restitution fines was not supported by the evidence and the amount of the fines was excessive; (10) the trial court erred by failing to instruct sua sponte with CALJIC No. 2.02; and (11) (with respect to Fletcher) the trial court erred by failing to strike certain "prior prison term" sentence enhancements once those enhancements had been "used" to impose an upper term of imprisonment with respect to the burglary conviction.

We shall conclude that the judgments entered below must be modified by staying execution of certain portions of the sentences which were imposed in accord with section 654 of the Penal Code. As so modified, we shall affirm those judgments.

STATEMENT OF FACTUAL AND PROCEDURAL BACKGROUND[3]

Late in the evening of October 17, 1990, Mary Katschman (Katschman) and her boyfriend, Adam Eddy (Eddy), were at home and playing darts at Katschman's Apple Valley residence. Katschman's two daughters, a three-year-old and a four-month-old, were also there at the residence. Katschman

---

[3]We set forth the facts of this case having viewed the evidence contained in the record on appeal "in the light most favorable to the judgment below." (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1081 [248 Cal.Rptr. 510, 755 P.2d 960].)

was waiting for her ex-husband (Bass) to come by and give her a ride over to a friend's house. The front door to the house was open.

Katschman noticed a strange car slowly pull up in front of the driveway to her home, and she shut and locked the front door. Peering through the peephole in the front door, Katschman noticed David and another man (later identified in court as Fletcher) approach the front door. At the same time, Eddy was watching David and Fletcher through a window located in one of the home's bedrooms. While looking through the bedroom window, Eddy saw the shadow of a third man (later identified in court as Jackson) standing in front of Katschman's garage door, swinging a baseball bat "like a baton."

When David reached the front door, he said something to the following effect: "Come on. Open the door up. I drove a long way. I'm really tired. I want some shit." Katschman assumed that David was referring to drugs, because he had on a previous occasion asked her for some drugs. Katschman told David (as she had on the previous occasion) that she didn't "do that anymore."[4]

While all of this was happening, Bass arrived at Katschman's home. As Bass approached Katschman's front door, David started yelling at him. David, Fletcher and Jackson all started walking toward Bass. The three men then "jumped" Bass.[5] At Katschman's direction, Eddy telephoned "911" and then handed the telephone over to her to report the altercation. After briefly describing the situation to the "911" operator, Katschman got disconnected from "911." She immediately took her older daughter into a back bedroom to have her (the daughter) stay with the baby daughter. While this was occurring, Eddy went and looked out of another bedroom window to see if anyone was still in the front yard, but he did not see anyone there. Bass then telephoned Katschman to tell her that he had escaped from the men chasing him, that he was telephoning from a neighbor's house and that the men were "coming back" to Katschman's house.

Eddy went to the bathroom and opened a window, at which point he heard footsteps approaching the house. Focusing on the footsteps, he observed "four guys diagonally cutting through our yard armed." By "armed," Eddy

---

[4] The previous occasion had occurred approximately two months before. At that time, David had contacted Katschman about purchasing a Pinto automobile of hers. Katschman told David that she wanted $50 for the car, and he indicated that he would come back later to complete the purchase. David left no security deposit to "seal" the purchase and he never returned to complete the purchase.

[5] Eddy testified that he was told this fact by Katschman. Katschman testified that she was told this fact by Eddy. Neither witness testified to having directly observed Bass being "jumped" by David, Fletcher and/or Jackson.

meant "with baseball bats." He called to Katschman, "Here they come." Katschman started to run toward the back bedroom in which her two daughters were located.

Before Katschman could reach her daughters, she heard her front door being forced open. The next thing she was aware of was that David and Fletcher were standing immediately behind her in the central hallway and David was asking, "Where's the dope?" Katschman responded by stating that she did not have any drugs. Fletcher appeared to be carrying a "stick or something."[6] Jackson then came into Katschman's view in the central hallway, swinging a baseball bat and saying, "Okay. Where's the stuff?"

Fletcher turned into the bedroom on the other side of the hallway, the bedroom in which Eddy was located, and turned on a light in that room. Jackson entered the bedroom in which Eddy was located, swung his bat and broke the light that Fletcher had just turned on. Katschman then heard Jackson demanding money from Eddy and heard Eddy "screaming": "Quit hitting me with the bat. Cool out. Quit hitting me with the bat." While Jackson was assaulting Eddy, Fletcher returned to the bedroom in which Katschman and her two children were located, approached Katschman with the small souvenir bat in his hand and demanded that she tell him "where the dope was." Fletcher then told Katschman "that they were going to tear [Katschman's] house apart, and if they found any [drugs] they were going to pulverize [her]."

Eddy had also heard the front door being forcibly opened. To Eddy, it sounded as if the door was being kicked open, and then Eddy was aware of "four guys rushing down the hallway yelling and screaming." David was in the front of the foursome; Fletcher was behind David and Jackson was third in line in the hallway. Eddy noticed that the fourth person in the foursome had a gun in his hands.[7] Jackson was swinging a baseball bat.

Jackson entered the bedroom where Eddy was by that time located by knocking back the bedroom door with his bat and putting a hole in the door. Eddy had a baseball bat in his hands for self-defense, but he dropped it because he did not want to get into a "bat fight" with Jackson. Jackson began to hit Eddy in the legs with his bat. Eddy fell to the ground on his back and began to fend off Jackson's blows with the balls of his feet. Jackson was "yelling and screaming": "Where's all your dope. Give me all your money." Douglas, who was standing in the hallway with a rifle in his hands, told

---

[6]Katschman later identified the "stick" as a "small Los Angeles Dodger's mini bat."
[7]Eddy later identified the fourth person as Douglas.

Jackson to "calm down."[8] Eddy gave his wallet to Jackson, but Jackson threw it back to Eddy and told him to take the money out of the wallet. Eddy did so, and gave the money in his wallet ($68) to Jackson.

At this moment, a deputy sheriff and a sergeant from the San Bernardino County Sheriff's Department (Cusemano and Williams, respectively) arrived at the Katschman residence. The two of them had been dispatched to the Katschman residence in response to the "911" call reporting the attack on Bass. As the officers exited their patrol cars, they could hear yelling and the sound of something being broken coming from the residence. The condition of the door and door frame indicated to the officers that the front door had been forcibly opened. The officers decided to make a "tactical entry" (weapons drawn) into the residence—which they proceeded to do, with Williams kicking the door fully open and entering the residence first.

The first person the officers saw was Douglas, who was standing at the junction of the front room and the bedroom hallway. Douglas was holding a rifle in his hands.[9] The officers disarmed Douglas and Williams placed him on the floor of the front room. Cusemano then proceeded down the hallway and, in turn, confronted David, Fletcher and Jackson and individually escorted each of those three intruders back to Williams in the front room.

On November 8, 1990, an information was filed by the People against the four defendants charging each of them with (a) one count of first degree residential robbery with respect to taking personal property from the immediate presence of both Eddy and Katschman, (b) one count of residential burglary with respect to the Katschman residence (identified in the information as being occupied by Eddy) and (c) one count of assault with a deadly or dangerous weapon (a baseball bat) or by means of force likely to produce great bodily injury with respect to Eddy. The information also charged various sentence enhancement allegations against each of the four defendants. (The particulars of the charges and enhancement allegations are set forth in greater detail below.)

On January 2, 1991, a jury trial was commenced in the matter. The People's case-in-chief adduced evidence which comports with the factual description of the events set forth above. None of the defendants testified on their own behalf. The only defense witness called by any of the defendants was Terry Fletcher (Terry), Fletcher's brother. Terry was called by Douglas and testified as follows:

---

[8]Katschman testified that prior to testifying she had never seen the rifle in question (which was introduced into evidence by the People).

[9]The rifle was later determined to be loaded with nine rounds of .22-caliber ammunition.

(a) Approximately one month before the date of the incident in question, he (Terry) had gone with David to the Apple Valley residence of a "Liz."[10]

(b) David had taken a rifle (which looked just like the one introduced into evidence at the trial) with him when he went to Liz's residence. David intended to use the rifle, together with some money, as a sort of "down payment" for a car.

(c) Terry had remained outside in his vehicle when David went inside Liz's residence.

(d) When David returned to Terry's vehicle, he no longer had the rifle, having left it at Liz's residence.

(e) The rifle in question was (or looked exactly like) the "family rifle" of the Farrow family, to which any member of the Farrow family would have had access if it was located at the Farrow residence.

On January 9, 1991, the jury returned guilty verdicts and sentence enhancement allegation true findings as to all matters which had been submitted to it for determination. The next day, in a bifurcated proceeding, the trial court found true all but one of the sentence enhancement allegation "priors" which had been alleged by the People as against David and Fletcher (the one exception being a "prior prison term served" sentence enhancement allegation which had been alleged against Fletcher). In summary, the guilty verdicts and sentence enhancement allegation true findings which were returned against the four defendants were as follows:

(1) As to David:

(a) One count of first degree residential robbery (count I) (Pen. Code, §§ 211 & 212.5, subd. (a))[11] and findings (i) that a principal in said offense was armed with a firearm within the meaning of section 12022, subdivision (a)(1), and (ii) that he (David) had twice previously been convicted of a serious felony within the meaning of section 667, subdivision (a).[12]

---

[10]Katschman was sometimes referred to as "Liz."

[11]Unless otherwise indicated, all citations to statutory sections refer to the Penal Code.

[12]In their respondent's brief, the People mistakenly assert that the trial court, on motion by the People, amended the information (before the bifurcated trial on the "priors") to charge "prior prison term served" (§ 667.5, subd. (b)) sentence enhancement allegations rather than "prior serious felony conviction" (§ 667, subd. (a)) sentence enhancement allegations as to counts I and II as against David. While this was done for Fletcher, the record clearly reveals that it was not done for David.

(b) One count of residential burglary (count II) (§ 459) and the same sentence enhancement findings as were found true with respect to count I.[13]

(c) One count of assault with a deadly weapon or by means of force likely to produce great bodily injury (count III) (§ 245, subd. (a)(1)) and findings that he (David) had twice previously served a separate prison term for the commission of a felony within the meaning of section 667.5, subdivision (b).

(2) As to Douglas:

(a) One count of first degree residential robbery (count I) (§§ 211 & 212.5, subd. (a)) and findings (i) that in the commission of said offense he (Douglas) personally used a firearm within the meaning of sections 1203.06, subdivision (a)(1) and 12022.5, subdivision (a) and (ii) that a principal in said offense was armed with a firearm within the meaning of section 12022, subdivision (a)(1).

(b) One count of residential burglary (count II) (§ 459) and the same sentence enhancement findings as were found true with respect to count I.

(c) One count of assault with a deadly weapon or by means of force likely to produce great bodily injury (count III) (§ 245, subd. (a)(1)).

(3) As to Jackson:

(a) One count of first degree residential robbery (count I) (§§ 211 & 212.5, subd. (a)) and findings (i) that a principal in said offense was armed with a firearm within the meaning of section 12022, subdivision (a)(1), and (ii) that in the commission of said offense he (Jackson) personally used a deadly or dangerous weapon within the meaning of section 12022, subdivision (b).

(b) One count of residential burglary (count II) (§ 459) and the same sentence enhancement findings as were found true with respect to count I.

(c) One count of assault with a deadly weapon or by means of force likely to produce great bodily injury (count III) (§ 245, subd. (a)(1)).

(4) As to Fletcher:

(a) One count of first degree residential robbery (count I) (§§ 211 & 212.5, subd. (a)) and findings (i) that a principal in said offense was armed with a firearm within the meaning of section 12022, subdivision (a)(1), and (ii) that he (Fletcher) had three times previously served a separate prison term for the commission of a felony within the meaning of section 667.5, subdivision (b).

---

[13]See footnote 12, *ante.*

(b) One count of residential burglary (count II) (§ 459) and the same sentence enhancement findings as were found true with respect to count I.

(c) One count of assault with a deadly weapon or by means of force likely to produce great bodily injury (count III) (§ 245, subd. (a)(1)) and findings that he (Fletcher) had three times previously served a separate prison term for the commission of a felony within the meaning of section 667.5, subdivision (b).

On March 6, 1991, David filed a motion for a new trial and/or for a modification of the verdicts and each of the other defendants joined in the motion. The trial court denied the motion as to each defendant. The trial court immediately thereafter proceeded to sentence the defendants in accord with the guilty verdicts and true findings which previously had been returned. The four defendants were sentenced as follows:

(1) David was sentenced to a total term of eighteen years in state prison, consisting of the following: (A) With respect to count II (residential burglary)—(i) an upper base term of six years, (ii) two consecutive five-year "prior serious felony conviction" sentence enhancements (§ 667, subd. (a)) and (iii) a consecutive one-year "principal armed with a firearm" sentence enhancement (§ 12022, subd. (a)(1)); and (B) with respect to count III (assault with a deadly weapon or by means of force likely to produce great bodily injury)—a consecutive one-year term (one-third the three-year midterm). Execution of all of the other sentence terms which were imposed by the trial court with respect to count I, as well as the other sentence enhancement terms which were imposed with respect to counts I and III, were stayed. The trial court also imposed a $5,000 restitution fine on David.

(2) Douglas was sentenced to a total term of nine years in state prison, consisting of the following: (A) With respect to count II (residential burglary)—(i) a middle base term of four years and (ii) a consecutive four-year midterm sentence enhancement for "personal use of a firearm" (§ 12022.5, subd. (a)); and (B) with respect to count III (assault with a deadly weapon or by means of force likely to produce great bodily injury)—a consecutive one-year term (one-third the three-year midterm). Execution of all of the other sentence terms which were imposed by the trial court with respect to count I, as well as the other sentence enhancement terms which were imposed with respect to counts I and III, were stayed. The trial court also imposed a $5,000 restitution fine on Douglas.

(3) Jackson was sentenced to a total term of seven years in state prison, consisting of the following: (A) With respect to count II (residential burglary)—(i) a middle base term of four years, (ii) a consecutive one-year

"principal armed with a firearm" sentence enhancement (§ 12022, subd. (a)(1)) and (iii) a consecutive one-year "personal use of a deadly weapon" sentence enhancement (§ 12022, subd. (b)); and (B) with respect to count III (assault with a deadly weapon or by means of force likely to produce great bodily injury)—a consecutive one-year term (one-third the three-year mid-term). Execution of all of the other sentence terms (including sentence enhancement terms) which were imposed by the trial court with respect to count I were stayed. The trial court also imposed a $5,000 restitution fine on Jackson.

(4) Fletcher was sentenced to a total term of eleven years in state prison, consisting of the following: (A) With respect to count II (residential burglary)—(i) An upper base term of six years, (ii) a consecutive one-year "principal armed with a firearm" sentence enhancement (§ 12022, subd. (a)(1)) and (iii) three consecutive one-year "prior prison term served" sentence enhancements (§ 667.5, subd. (b)); and (B) with respect to count III (assault with a deadly weapon or by means of force likely to produce great bodily injury)—a consecutive one-year term (one-third the three-year mid-term). Execution of all of the other sentence terms which were imposed by the trial court with respect to count I, as well as the other sentence enhancement terms which were imposed with respect to counts I and III, were stayed. The trial court also imposed a $5,000 restitution fine on Fletcher.

Each of the four defendants thereafter filed a timely appeal.

Additional facts will be referred to, as needed, in the discussion which follows. We will address the issues raised on appeal in the order in which those issues can be resolved most efficiently and logically.

DISCUSSION

I.

ALLEGED INSTRUCTIONAL ERRORS

The defendants contend that the trial court committed four instances of reversible error by failing or refusing to instruct the jury in a particular manner. We will here discuss three of the instances identified by the defendants and conclude that none of these three instances requires redress by this court. We will address the fourth asserted instructional error (concerning the degree of the burglary and robbery convictions) in a different context later in this opinion.

### A. Allegedly Erroneous Failure to Give Requested Instructions Concerning Lesser Related Offenses.

Fletcher's counsel requested the trial court to instruct the jury as to the offenses of vandalism (§ 594) and trespass (§ 602.5—trespass into a non-commercial dwelling house) as lesser related offenses to the charged residential burglary. Counsel for David and counsel for Jackson joined in this request, but counsel for Douglas did not. The trial court denied the request, stating: "The two crimes that you desire to have given are not necessarily related or included in the charged crimes, so the court is going to deny the request." All four defendants assign this denial as reversible error.

 While a resolution of this issue as it relates to David, Fletcher and Jackson requires a somewhat lengthy discussion and analysis, it does not insofar as it relates to Douglas. *People* v. *Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055] (hereinafter cited simply as *Geiger*), the cornerstone authority upon which virtually the entire construct of California law concerning the giving of "lesser related" instructions is built, states unequivocally: "Since *sua sponte* instructions would conflict with the defendant's right to notice of the charges, there is no obligation to instruct on related offenses in the absence of a request by the defendant for such instructions." (35 Cal.3d at p. 530.) Inasmuch as trial counsel for Douglas did not request instructions on the lesser related offenses of trespass and vandalism, the trial court was not obligated to give the same and Douglas will not be heard to complain that the trial court erred by refusing to do so.[14]

 That leaves us, then, to address the issue at hand as it relates to David, Fletcher and Jackson. To do so, we turn once again to *Geiger*.

---

[14]Douglas argues that, inasmuch as the instructions which were given below were given uniformly as to all four defendants, he should be able to maintain the same arguments on appeal as the other defendants. We reject Douglas's argument for the simple reason that we are not inclined to blithely disregard an unequivocal, relevant legal principle declared by our Supreme Court.

Douglas also contends, in a somewhat cursory manner, that it would have been futile for him to have requested instructions on the "lessers" here in question because the request for those instructions by the other defendants had been denied by the trial court. This contention is plainly contradicted by the record. The trial court did not deny the request to instruct on trespass and vandalism as lesser related offenses of the charged residential burglary until well after everyone had been given ample opportunity to join in the motion and present argument on the same to the trial court.

Finally, we note that David's motion for a new trial, in which Douglas joined, did assert the trial court's refusal to instruct on trespass and vandalism as lesser related offenses to the charged residential burglary as one of the grounds for a new trial. This "after the fact" joinder, however, can hardly be deemed compliance with *Geiger's* requirement that instructions on "lesser relateds" be requested by defense counsel.

On a related matter, we do not mean our rather peremptory dismissal of Douglas's contention on this issue to suggest that we view Douglas's counsel as having been in any way

■ *Geiger*, in general terms, described "the circumstances in which a defendant is entitled to instructions on related, but not necessarily included, offenses" in the following manner: (1) ". . . the first prerequisite to receiving instructions on lesser related offenses must be the existence of some basis, other than an unexplainable rejection of prosecution evidence, on which the jury could find the offense to be less than that charged"; (2) "Second, the offense must be one closely related to that charged and shown by the evidence. . . . Although some evidence offered by the People or the defendant may indicate that the defendant has committed a crime other than that charged, instructions regarding that crime need not be given unless the evidence is also relevant to and admitted for the purpose of establishing whether the defendant is guilty of the charged offense"; and (3) "Finally, the instructions must be justified by the defendant's reliance on a theory of defense that would be consistent with a conviction for the related offense. Thus, the instruction need not be given if the defense theory and evidence reflect a complete denial of culpability as when the defense is alibi, or the only issue is identity, unless the defendant argues that the evidence at most shows guilt only of the related offense." (35 Cal.3d at pp. 531-532.)

Importantly, immediately following the above description of limiting "circumstances," "factors" or "criteria," the *Geiger* opinion set forth the following caveat and guideline: "We cannot, of course, anticipate all of the varied circumstances in which instructions on related offenses may be requested. We do not foreclose the possibility that experience will teach that these criteria are over- or underinclusive. In doubtful situations, however, the determinative factor should be whether the option to convict a defendant of a related offense is reasonably necessary to insure that the jury is afforded the opportunity to decide all material issues presented by the evidence in accord with the defendant's theory of the case, where denial of that opportunity might undermine the reasonable doubt standard." (35 Cal.3d at p. 532, fn. 12.)

■ The first and third "*Geiger* criteria" are relatively easily applied in this case:

(1) With respect to the "first *Geiger* criterion," there was an evidentiary basis upon which the jury could have concluded that the defendants had committed trespass and vandalism rather than burglary. The sole felonious intent upon which the prosecution based its theory of burglary (that is, the

---

professionally incompetent in not having joined with the other counsel in requesting instructions on vandalism and trespass as "lessers" to the charged residential burglary. It may well be that Douglas's counsel, for sound tactical reasons, wished to present Douglas's case to the jury on an "all or nothing" basis as to that charge.

sole felonious intent at the time of entry into Katschman's residence), and the sole basis upon which the prosecuting attorney argued the matter to the jury, was the intent to commit a robbery. However, throughout the trial and during their closing argument, defense counsel cast doubt on the credibility of this theory of the case by pointing out (indeed, by focusing on) the fact that, insofar as the trial evidence showed, the money that was allegedly taken from Eddy by Jackson was never recovered or otherwise accounted for—notwithstanding the fact that Williams and Cusemano took Jackson into custody literally within moments of his allegedly having taken the money from Eddy.[15] Further, the evidence at trial revealed another possible intent, other than robbery, for the defendants' having entered the Katschman residence: A desire to commit trespass and vandalism as an outpouring of anger over having been turned away after they (the defendants) had driven a long way to consummate a drug purchase.[16]

 (2) With respect to the "third *Geiger* criterion," the giving of instructions on trespass and vandalism as lesser related offenses to the charged burglary would have been entirely consistent with the defense theory put forward by each of the defendants. All of the defendants argued to the jury that there had been no robbery—hence, there had been no intent to commit a robbery upon entering the Katschman residence—hence, there had been no burglary.

It is the second of the "*Geiger* criteria"—i.e., that the uncharged, lesser related offense be "closely related to that charged and shown by the evidence"—that is the most difficult to clearly assess and apply in this case.[17] The difficulty arises, however, not from the evidence which is peculiar to this case but, rather, from the fact that the "closely related" criterion itself has become obfuscated by the reported California opinions which have discussed and applied it. In large part, this obfuscation is a result of an "unreflective

---

[15]This attack on the credibility of the prosecution's theory of the case applies equally, although not as forcefully, to the possibility that the felonious intent attending the defendants' entry into Katschman's residence was the intent to steal drugs, not money. The defense strategy was to attack the credibility of Katschman and Eddy *generally*.

[16]It is irrelevant that we might find this "alternative explanation" weak and unconvincing: "We recognize . . . [that] a defendant's right to instructions does not turn on the court's assessment of the strength of the evidence, or on whether there is a conflict in, rebuttal to, or impeachment of the People's evidence." (*Geiger*, 35 Cal.3d at p. 531; see also [concerning the related subject of giving instructions on "lesser included" offenses] *People v. Glenn* (1991) 229 Cal.App.3d 1461, 1465, [280 Cal.Rptr. 609] and authorities cited therein.)

[17]We note that the trial court seemed to rely primarily on this "second *Geiger* circumstance" in refusing to instruct on trespass and vandalism. The trial court specifically refused to give the instructions on the basis of its conclusion that those lesser related offenses were not "necessarily related or included in the charged crimes."

reliance" which has been inappropriately placed on some of *Geiger*'s phraseology by certain appellate courts.[18] Specifically, cases which have discussed and applied the "closely related" *Geiger* criterion have oftentimes inappropriately focused and relied on the following statement in *Geiger*: "The [lesser related offense] is related to [the charged offense] *since it is made an offense to protect the same societal interest*—security of property—as [the charged offense]." (35 Cal.3d at p. 532, italics added.)

■ In order to understand the improper emphasis and "unreflective reliance" which some courts have placed on *Geiger*'s "same societal interest" phrase, it is important to understand where that phrase came from and the context in which *Geiger* had reference to it. In examining ex forum opinions which had held "that instructions on uncharged related offenses must also be given if it would be fundamentally unfair to deny the defendant the right to have the court or jury consider the 'third option' of convicting the defendant of the related offense" (*Geiger*, 35 Cal.3d at p. 520), *Geiger* referred at length to *United States* v. *Whitaker* (D.C. Cir. 1971) 447 F.2d 314 (hereinafter cited simply as *Whitaker*). Among the *Whitaker* passages quoted by *Geiger* is the following: " 'A more natural, realistic and sound interpretation of the scope of "lesser included offense," in line with our own views on the subject, is that defendant is entitled to invoke Rule 31(c) when a lesser offense is established by the evidence adduced at trial in proof of the greater offense, with the caveat that there must also be an "inherent" relationship between the greater and lesser offenses, i.e., *they must relate to the protection of the same interests*, and must be so related that in the general nature of these crimes, though not necessarily invariably, proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense. This latter stipulation is prudently required to foreclose a tendency which might otherwise develop towards misuse by the defense of such rule. In the absence of such restraint defense counsel might be tempted to press the jury for leniency by requesting lesser included offense instructions on every lesser crime that could arguably be made out from any evidence that happened to be introduced at trial.' (447 F.2d at p. 319, fn. omitted.)"[19] (*Geiger*, 35 Cal.3d at p. 521, italics added.)

When *Geiger* articulated the second of the "criteria" constraining the giving of "lesser related instructions," it made reference once again to *Whitaker*, only to reject any rigid application of *Whitaker*'s "inherent relationship" standard. It said: "The District of Columbia Circuit and the courts

---

[18]The phrase "unreflective reliance" is taken from *People* v. *Thomas* (1992) 2 Cal.4th 489, 517 [7 Cal.Rptr.2d 199, 828 P.2d 101]. We discuss *Thomas*, insofar as it relates to the issue before us here, later in the main text of the opinion.

[19]The "Rule 31(c)" to which the *Whitaker* opinion had reference is the rule in the Federal Rules of Criminal Procedure (18 U.S.C.) that requires the giving of instructions on "lessers."

adopting the *Whitaker* approach have limited instructions to those on offenses having an 'inherent relationship' with the charged offense in order to prevent 'abuse' by defendants seeking to appeal to the jury's sense of mercy by requesting instructions on every offense that is arguably shown by the evidence. We agree that the right to instructions on related offenses is not without limit. The purpose of the rule, *however*, serves to define its limits." (35 Cal.3d at p. 531, italics added.) Interestingly, though, when *Geiger* actually applied its three-fold "criteria" to the facts of that case, it seemed to implicitly "turn back" to *Whitaker*'s "inherent relationship" standard, which standard *included* the "same societal interest" consideration. (*Geiger*, 35 Cal.3d at p. 532; see *ante*.)

Several subsequent opinions have "unreflectively relied" on *Geiger*'s "same societal interest" factor as a virtual sine qua non for establishing the existence of *Geiger*'s "closely related" criteria for the giving of instructions on lesser related offenses:[20]

(1) *People* v. *Boyd* (1985) 167 Cal.App.3d 36, 47 [212 Cal.Rptr. 873]: "Attempted possession of cocaine is not closely related to the charge of armed robbery. The societal interest in proscribing robbery—security of personal property from a felonious taking—has no relationship to the societal interest in proscribing the possession of narcotics—elimination of a dangerous substance the use of which represents a serious risk to the health and welfare of the appellant and perhaps others who might come into unlawful possession thereof."

(2) *People* v. *Santos* (1990) 222 Cal.App.3d 723, 739-740 [271 Cal.Rptr. 811]: "The crimes charged and battery protect the same societal interest—the security of the person."

(3) *People* v. *Hill* (1992) 6 Cal.App.4th 33, 40 [8 Cal.Rptr.2d 123]: "*Geiger* thus declined to adopt the full restrictive language of *Whitaker* . . . . It did not, however, shun the requirement that, to be 'closely related,' a lesser related offense must serve a societal interest like the one served by the charged crime."

(4) *People* v. *Araujo* (1992) 10 Cal.App.4th 700, 704 [12 Cal.Rptr.2d 662]: "The elements of the two offenses are entirely different as are the societal interests they serve . . . ." (Fn. omitted.)

By way of contrast, at least one subsequent opinion has interpreted *Geiger* as rejecting the entirety of *Whitaker*'s "inherent relationship" limitation—

---

[20]Indeed, some opinions seem almost to treat the "same societal interest" factor and the "closely related" criteria as being virtually synonymous.

including the "same societal interest" factor. In *People* v. *Blevins* (1990) 220 Cal.App.3d 1413, 1416-1417 [270 Cal.Rptr. 172], the court stated: "In setting forth that requirement [the "closely related" requirement] the Supreme Court in *Geiger* explained that it was not necessary for the offenses to have an 'inherent relationship' as that terminology had been defined in [*Whitaker*] . . . . Instead, while agreeing 'that the right to instructions on related offenses is not without limit' [citation], the court found the limits in the purpose of the rule. . . . [¶] *In other words, the second prerequisite is established when the evidence offered by either side [which would support the giving of instructions on a lesser related offense] is relevant to and was admitted for the purpose of establishing whether the defendant is guilty [vel non] of the charged offense.*" (Bracketed phrases and italics added.)

We are of the view that *Blevins* has correctly stated the proper interpretation of *Geiger*'s "second criteria" and that *Boyd, Santos, Hill,* and *Araujo* are incorrect in finding a "same societal interest" criterion, factor, prerequisite or test in *Geiger*. We reach this conclusion in recognition of (i) the fact that the actual wording of *Geiger*'s "closely related" criterion (at p. 531 of that opinion) focuses on *the evidence adduced at trial to establish whether the defendant is guilty of the charged offense,*[21] and (ii) the fact that the analytical underpinnings of *Geiger* themselves involve an *evidentiary* orientation rather than a theoretical sociological approach. In this latter regard, we once again note that the *Geiger* opinion itself identified "the *determinative* factor" in deciding whether to give instructions on lesser related offenses as the need "to insure that the jury is afforded the opportunity to decide *all material issues presented by the evidence* in accord with the defendant's theory of the case." (35 Cal.3d at p. 532, fn. 12, italics added in both quoted phrases.)

An excellent example of the application of this "relevant evidence analysis" principle is found in *People* v. *Araujo, supra,* 10 Cal.App.4th 700—notwithstanding that opinion's erroneous conclusion that the "same societal interest" factor was a part of the "closely related" criterion.

In *Araujo,* the defendant was charged with residential burglary. Included in the prosecution's evidence was testimony that the defendant had visited friends in a truck matching the description of a truck which had been stolen from the burglarized residence. Defense counsel requested an instruction on joyriding (§ 499b) as a lesser related offense. The trial court refused to give a joyriding instruction, and the Court of Appeal upheld the trial court in this regard. Importantly, the Court of Appeal noted:

---

[21]"Although some evidence offered by the People or the defendant may indicate that the defendant has committed a crime other than that charged, instructions regarding that crime need not be given unless the evidence is also relevant to and admitted for the purpose of establishing whether the defendant is guilty of the charged offense." (35 Cal.3d at p. 531.)

"It is true that the prosecution used evidence of the joyriding episode for purposes of proving residential burglary. Appellant's act in driving the Vegas' pickup truck to Valley Springs served to link him with the burglary because the truck's keys had been left by the Vegas inside their house and because one of the people accompanying him was in possession of some of the stolen property. However, these aspects of the joyriding incident relate to the burglary only circumstantially and not in any direct way." (10 Cal.App.4th at p. 705.)

Key to *Araujo*'s distinction between a "circumstantial relation" of evidence and a "direct relation" of evidence is that court's conclusion that the evidence of the joyriding incident was relevant to the *charged* offense, burglary, *only* to the extent that it permitted the jury to infer that the defendant had entered the Vegas' residence with felonious intent (to take the truck keys and personal property). Thus, insofar as the charged burglary was concerned, the "evidence of joyriding" was actually relevant to the issues of the case only to the extent that it constituted "evidence of residential entry with felonious intent." That is, the "evidence of joyriding," simply as "evidence of joyriding," was *not* relevant to the issues of the case. Viewed in this manner, the evidence in question in *Araujo* did not establish that the charged burglary and the joyriding were "closely related" crimes—and the requested instruction would have been properly refused for that reason alone.

The situation thus presented by numerous courts having incorrectly interpreted *Geiger* as mandating a "same societal interest" test for determining whether a charged offense and an uncharged, lesser related offense are "closely related" is analogous in significant respects to the situation which presented itself to our Supreme Court in *People* v. *Thomas, supra*, 2 Cal.4th 489 (hereinafter cited as *Thomas*) and *People* v. *Perez* (1992) 2 Cal.4th 1117 [9 Cal.Rptr.2d 577, 831 P.2d 1159] (hereinafter cited as *Perez*). In *Thomas* and *Perez*, our Supreme Court found it necessary to "redirect" those appellate courts which, in reviewing whether the evidence in a case supported a finding that a murder had been committed with premeditation and deliberation, had been applying a threefold "test" set forth in *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] in a rigid, formulaic manner. In response to this interpretation of *Anderson, Thomas* stated: "Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference . . . ." (2 Cal.4th at p. 517.) This was followed in *Perez* by these two statements: (1) "The *Anderson* guidelines are descriptive, not normative." (2 Cal.4th at p. 1125); and (2) "In identifying categories of evidence bearing on

premeditation and deliberation, *Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. . . . The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Ibid.*)

We conclude that the three criteria set forth in *Geiger* with respect to the giving of instructions on lesser related offenses were intended by our Supreme Court to be used and applied in the same general manner as the three *Anderson* factors were intended by our Supreme Court (as per *Thomas* and *Perez*) to be used and applied with respect to findings of premeditation and deliberation—as general, descriptive guidelines useful in the analysis and evaluation of evidence. (This is, perhaps, especially true of *Geiger*'s "closely related" criterion.) We find particular support for this conclusion in the tenor of the language used by our Supreme Court in the previously quoted footnote 12 of *Geiger* (35 Cal.3d at p. 532): "We cannot, of course, anticipate all of the varied circumstances in which instructions on related offenses may be requested. We do not foreclose the possibility that experience will teach that these criteria are over- or underinclusive. . . ."

And here, then, lies our considered explanation for *Geiger*'s use of *Whitaker*'s "same societal interest" language in the context of its discussion of whether the crimes there in issue were "closely related"—after earlier having apparently dismissed that approach by giving deference to *Whitaker* only to the extent of saying: "We agree that the right to instructions on related offenses is not without limit." (35 Cal.3d at p. 531.) *Geiger* was not saying that a finding of the "same societal interest" is *necessary* to a finding that two crimes are "closely related"—but only that a consideration of "societal interest" is, or can be, a useful concept for a trial court (or an appellate court) to employ in analytically "double checking" whether the evidence shows two crimes to be "closely related." For example: (1) If the two crimes in question clearly address the "same societal interests," then perhaps it will behoove the court to consider, somewhat more closely than the evidence would otherwise superficially seem to require, the question of whether those crimes are "closely related"; and (2) In a similar vein, if two crimes appear superficially to be "closely related" but clearly address disparate "societal interests," then perhaps the apparent "closeness" of the crimes needs further examination. The concept of "same societal interest" is a *tool* for looking at the question of whether two crimes are "closely related"—but the *critical factor* which underlies that question is whether the *evidence* establishes the requisite "closeness" of the two crimes.

 It remains to apply this understanding of *Geiger*'s "closely related" criterion to the facts of this case. Here, the charged burglary and the lesser

related offenses of trespass and vandalism *are* "closely related." First, the evidence which would have established the trespass (the forcible entry through the front door) also established the entry element of the charged burglary. Second, the evidence which would have established the vandalism (the damaged front door/door frame, the damaged bedroom door and the broken light) also established, at least in part, the force/fear element of the charged robbery—which robbery, in turn, served as the basis of inferring the felonious intent element of the charged burglary.

Given all of the above, the trial court did err in refusing to give the requested instructions on trespass and vandalism as lesser related offenses to the charged burglary. ■ Reaching that conclusion, however, does not end the matter: "[T]he error 'is not prejudicial if "it is possible to determine that . . . the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. . . ." [Citations.]' (*People v. Turner* (1990) 50 Cal.3d 668, 690-691 [268 Cal.Rptr. 706, 789 P.2d 887].)" (*People v. Weathington* (1991) 231 Cal. App.3d 69, 79 [282 Cal.Rptr. 170]; see also, *Geiger, supra*, 35 Cal.3d at p. 532.)

■ Here, the trial court's error was not prejudicial. In order to have returned convictions on charges of trespass and/or vandalism but acquittals on the charged burglary, the jury would have had to have concluded that one of the two following scenarios had been established by the evidence: (1) There never was a robbery—and, thus, the defendants had no felonious intent to commit a robbery when they entered the Katschman residence; or (2) The defendants had no felonious intent to commit a robbery when they entered the Katschman residence—but one or more of the defendants formed the intent to commit a robbery once they were inside the residence and the other defendants at that point in time decided to aid and abet the commission of the "afterthought robbery." Given the jury's return of guilty verdicts on the charged robbery, the jury clearly rejected the first of the above scenarios—and *no* rational juror, given the extremely condensed time frame within which the events in question occurred and the unequivocal testimony concerning the behavior of the defendants as they entered the Katschman residence, could have found the second of the above scenarios to have been established by the evidence adduced in this case.

Inasmuch as the trial court's error in refusing to instruct on the lesser related offenses of trespass and vandalism was not prejudicial, we will not reverse the burglary convictions because of such error.

## I. B.-V. D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgments hereinbelow imposed, and each of them, are hereby and herewith modified by staying execution of that one-year portion of the sentences which were imposed with respect to count III, said stay to become permanent upon the successful completion of the remainder of those sentences, and each of them, as to prison terms. As so modified, said judgments are affirmed.

This matter is remanded to the trial court with directions that it prepare amended abstracts of judgment in accordance with this opinion and transmit copies of said amended abstracts to the appropriate correctional authorities.

Ramirez, P. J., concurred.

**DABNEY, J.,** Concurring and Dissenting.—I concur in the result and most of the court's opinion. I dissent from that portion of the majority opinion which precludes punishment for the assaultive conduct of the defendants pursuant to Penal Code section 654.

I am unimpressed by the majority conclusion that the assaultive violence cannot be separated from the robbery conviction for purposes of additional punishment. *People v. Nguyen* (1988) 204 Cal.App.3d 181, 190 [251 Cal.Rptr. 40], held that "gratuitous violence against a helpless and unresisting victim . . . has traditionally been viewed as not 'incidental' to robbery for purposes of section 654." That rationale applies in this case. A reading of the manner in which this incident unfolded demands the assault be separately punished. There is not logical justification for this act of clemency by the majority.

The problem with my position is that I have failed to garner one more vote.

The petitions of both respondent and appellants for review by the Supreme Court were denied June 3, 1993.

---

*See footnote, *ante*, page 1606.