Filed 10/23/14  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSEPH RODRIGUEZ,<br><br>    Defendant and Appellant. | F066414<br><br>(Super. Ct. No. F09906122)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Denise L. Whitehead, Judge.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Jeffrey Grant, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A fight between appellant Joseph Rodriguez (Rodriguez) and his father, Joseph Rodriguez, Sr., left the older man severely injured. At the time of the incident, Rodriguez was 44 years old, unemployed, and living in a room at his father's home in Clovis. The

altercation began after the victim, then age 64, berated his son for drinking alcohol in violation of the house rules. Rodriguez reacted by beating him with a heavy object.

Although he claimed self-defense under police questioning, Rodriguez was charged with premeditated attempted murder and aggravated mayhem. He pled not guilty and not guilty by reason of insanity. During both the guilt and insanity phases of his jury trial, Rodriguez attributed his behavior to sleeping disorders which purportedly rendered him unconscious and incapable of understanding the nature of his conduct. The jury convicted him of aggravated mayhem and attempted murder without premeditation, and found that he was not legally insane at the time of the offenses. He was sentenced to life in prison with the possibility of parole.

On appeal, Rodriguez presents a claim of ineffective assistance of counsel based on his trial attorney's decision not to instruct the jury with CALCRIM No. 3428 ("Mental Impairment: Defense to Specific Intent or Mental State"). Defense counsel elected to use standard jury instructions on unconsciousness (CALCRIM No. 3425) and voluntary intoxication (CALCRIM No. 3426), but declined the trial court's suggestion that she add the pinpoint instruction set forth in CALCRIM No. 3428 regarding the negation of specific intent as a result of mental disease, defect, or disorder. We find no grounds for reversal on this issue.

In a separate argument, Rodriguez contends that the trial court erred by failing to instruct the jury with CALCRIM No. 226 ("Witnesses") during the insanity phase. This standard form instruction on witness credibility was used during the guilt phase. The insanity phase consisted of testimony by three expert witnesses, and the trial court instructed the jury pursuant to CALCRIM No. 332 ("Expert Witness Testimony") without repeating the general principles outlined in CALCRIM No. 226. Again, we find no prejudicial error.

Besides challenging his convictions, Rodriguez correctly identifies a miscalculation of his presentence time credits and errors in the abstract of judgment. His

2.

sentence will be modified to include an additional 50 days of presentence custody and conduct credit against his prison term. The abstract of judgment will be corrected to reflect the sentencing modification and to indicate that Rodriguez was convicted of attempted murder under Penal Code sections 664 and 187 (the abstract erroneously states that he was found guilty of premeditated attempted murder under Penal Code section 205). We affirm the judgment as so modified.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 26, 2009, at approximately 6:48 p.m., officers from the Clovis Police Department were dispatched to the victim's home in response to a 911 call. The call was placed by Joseph Rodriguez, Sr., who informed the dispatcher that his son, "Joe Rodriguez," had been drinking all day and became combative after he was told to leave the house. Breathing heavily as he spoke, the caller indicated that his son had struck him with a one-inch by four-inch (1" x 4") board. He denied needing medical assistance, but asked that police be sent out to remove his son from the premises. As the call continued, Rodriguez approached his father and began cursing at him. The caller said, "Don't pick that up Joe. Don't … Oh you son of a bitch. Joe … No. No." This was followed by the sound of moaning. Rodriguez told his father to "get up," and the line went dead.

Police found the victim lying in a pool of blood on his kitchen floor. He had sustained extensive injuries to his head and face, and was unable to communicate with the investigating officers. Paramedics took the victim to the hospital while police spent the next several hours processing the crime scene. Rodriguez fled prior to their arrival, but went back to the house around 9:00 p.m. He was arrested upon his return and taken to the Clovis police station.

Detectives conducted three interviews with Rodriguez; one on the night of his arrest and two in the early morning hours of the following day. The first interview began shortly before 10:00 p.m. and ended at approximately midnight. Rodriguez recounted multiple versions of the incident during this initial session, but steadfastly maintained that

3.

he had acted in self-defense. He described the victim, i.e., his father, as a fearsome Marine veteran who weighed at least 275 pounds and had a bad temper. According to Rodriguez, his father had tried to kill him during a fit of rage.

Rodriguez explained that he had spent the day lounging in his room and was still in bed when his father returned home from buying food late in the afternoon. His father burst into the room, accused Rodriguez of drinking alcohol, and forced him out of bed. A fight ensued as his father wrestled him to the floor and gouged his eyes. When the altercation moved to the living room, Rodriguez picked up a ceramic Buddha statue, threw it at his father's chest, and ran out of the house. He estimated that the statue, which broke into pieces upon impact, weighed about 25 pounds.

Rodriguez described the first part of the incident in detail, recalling things such as the stench of his father's body odor and the weight of his frame pressing against him as they wrestled on the floor. Nevertheless, his story underwent several changes over the course of the interview. Rodriguez initially said that he was reading a newspaper when his father attacked him. He later claimed to have been asleep immediately prior to the altercation. Rodriguez switched back and forth between both versions at least five times, and once in the same sentence ("I was sitting in my room sleep... I mean was reading the paper."). In a third version, he had been sitting on the edge of his bed watching sports when his dad came in and knocked him to the ground.

There were also discrepancies concerning the timing of the 911 call and Rodriguez's departure from the home. Rodriguez originally claimed that he threw the Buddha statue at his father before the call was initiated and then heard his father talking on the phone as he was leaving the residence. He later said that the statue broke during the 911 call, which further infuriated his father and prompted him to chase Rodriguez through the house in an effort to prevent his escape. Rodriguez reverted back to the first sequence of events at other times during the interview, but ultimately settled upon a

4.

version where his father was chasing him, knocking him to the ground, and kicking him, all while speaking to the 911 dispatcher on a cordless telephone.

The first interview concluded with a discussion about Rodriguez's alcohol consumption. Rodriguez described himself as a recovering alcoholic, explaining that he had broken his sobriety after purchasing a 750 milliliter bottle of vodka the prior evening. He allegedly consumed six drinks within five or six hours of the incident. When asked to estimate his level of drunkenness at the time of the fight, Rodriguez said he was about a 3 or 4 on a scale of 0-10. He felt sober at the time of the interview, which he equated with a zero on the same scale. A blood sample drawn shortly after midnight on October 27, 2009, in the interim between the first and second interview, showed his blood alcohol level to be .19 percent.

During the second and third interviews, detectives advised Rodriguez that his story did not match up with the evidence found at the scene. After being shown photographs of the victim's injuries, he conceded that the statue could have hit his father in the head rather than in the chest. However, he denied striking the victim with a 1" x 4" and insisted that he only threw the statue at him one time. Rodriguez further maintained that he had exited the home through a door to the garage, even after he was told that the door was bolted shut from the inside when police arrived and no blood had been found in that part of the house. He claimed his father must have somehow locked the door before collapsing in the kitchen, despite the fact that he would have been bleeding profusely from his injuries.

The Fresno County District Attorney charged Rodriguez by amended information with one count of attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a); Count 1) and one count of aggravated mayhem (Pen. Code, § 205; Count 2).[1] An enhancement allegation was attached to Count 1 for personal

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

infliction of great bodily injury (§ 12022.7, subd. (a)). Rodriguez entered a general plea of not guilty and a special plea of not guilty by reason of insanity. Trial proceedings were delayed several times for various reasons, including the need for two court-appointed experts and one retained defense expert to conduct psychiatric evaluations of the defendant. The matter was tried before a jury in September and October 2012.

Guilt Phase

The prosecution's case included an audio recording of the 911 call, video recordings of Rodriguez's custodial interviews, photographs of the crime scene, and pictures of the broken Buddha statue. The jury was also shown a diagram of the layout of the victim's home and video footage of the interior. An investigating officer testified that the recovered pieces of the statue collectively weighed about 13 pounds.

Corporals Dustin Dodd and Lonnie Amerjan of the Clovis Police Department testified in relation to their respective crime scene investigations and on the topic of blood splatter analysis. Both opined that the victim was struck multiple times in the head with a blunt force object. They also explained how several aspects of Rodriguez's version of the events, as told to detectives at the time of his arrest, were inconsistent with the evidence found at the scene.

The nature and extent of the victim's injuries were established through the testimony of medical professionals. Rodriguez's father sustained a LeFort III fracture, which is a serious injury characterized by broken bones throughout the facial region above the lower jaw. One doctor described it as a separation of the face from the skull, or craniofacial disassociation. In addition to being left with physical deformities, the victim lost several teeth and became permanently blind in his right eye. Rodriguez admitted the allegations of great bodily injury at the close of evidence.

The defense case consisted of three witnesses. The first witness was Dr. Alan Barbour, a forensic toxicologist. Dr. Barbour testified that the blood sample drawn from Rodriguez at the time of his arrest showed a blood alcohol level of .19 percent and the

6.

presence of valium, which likely exacerbated the intoxicating effects of the alcohol. He explained that most people with a blood alcohol level of .19 percent appear "obviously intoxicated to the casual observer," and mixing that much alcohol with valium "would make it much worse." A chronic alcoholic might be able to mask the outward signs of intoxication, but would nevertheless be impaired. Dr. Barbour's testimony was followed by that of an officer from the Clovis Police Department who was called to address chain-of-custody issues with respect to the blood sample.

The final defense witness was Dr. Avak Howsepian, a board certified psychiatrist and neurologist. Dr. Howsepian spent approximately 50 hours working on Rodriguez's case in preparation for trial. After meeting with Rodriguez and analyzing the evidence pertaining to the incident with his father, he concluded that the defendant suffered from parasomnias, i.e., sleeping disorders that cause "a disturbance in behavior, or in a person's physiology," which occurs either in the transition between being awake and falling asleep or from sleeping to waking up. More specifically, Dr. Howsepian believed Rodriguez experienced two types of parasomnia on the day in question: confusional arousal and nocturnal wandering.

Confusional arousal was described as a phenomenon that can occur during a stage of non-REM sleep when an individual is startled or forcibly awakened. The person may get up and interact with others, but is actually still sleeping. In Dr. Howsepian's words, the startling event will cause the person "to become animated and often verbal in virtue of some things kind of prompting them, or stimulating them to be aroused in that way[,]" but they are confused and typically disoriented. "They don't have a continuous integrated perception of their environment because they're not yet awake, and they act in ways, often, that can be aggressive…." As with other parasomnias, confusional arousal is "often associated with aggressive behavior, because an individual misinterprets their environment because they're cloudy in their judgment and their perceptions in ways that don't allow them to respond in a usual way to whatever it is they're confronting."

7.

Rodriguez's consumption of alcohol and valium further influenced Dr. Howsepian's opinion, since both substances "are well-known predisposing factors for confusional arousals."

The expert described nocturnal wandering as something similar to sleepwalking, but differentiated by certain behavioral characteristics. Whereas sleepwalkers typically move slowly and appear to be in a state of slumber, a nocturnal wanderer has their eyes open, moves quickly, is much more verbal, and can become very aggressive. Dr. Howsepian explained that people who experience nocturnal wandering are also in a non-REM stage of sleep, despite "looking like they're wide awake, and looking like they're performing acts that are deliberate and intentional. In fact, they're part of their sleep pathology, acting in ways that are not in their voluntary control at these times."

Given his belief that Rodriguez experienced confusional arousal and nocturnal wandering at the time of the incident, it was Dr. Howsepian's opinion that he "would not [have been] voluntarily acting in ways that he would ordinarily act." Defense counsel tried to elicit an opinion regarding whether or not Rodriguez was "legally unconscious" at the time, but each attempt was met with objections that were sustained on the grounds of calling for a legal conclusion. Counsel was permitted to ask if people who experience parasomniac episodes are able to make "deliberate principle[d] moral decisions" in those states, to which Dr. Howsepian replied, "No."

The jury deliberated for two days, during which time they asked to review the 911 call, Rodriguez's interviews with police, and video footage of the crime scene. On the second day of deliberations the jury advised the court that it was having "difficulty reaching a unanimous agreement on the greater crime." After receiving further instructions, the jury convicted Rodriguez of attempted murder under Count 1, but found the crime was committed without premeditation or deliberation. Rodriguez was found guilty of aggravated mayhem as charged in Count 2.

8.

Insanity Phase

Proceeding with the burden of proof on the issue of insanity, the defense again called Dr. Howsepian to testify in regards to Rodriguez's mental state at the time of the offenses. The expert reiterated his conclusion that Rodriguez had experienced confusional arousal and nocturnal or "episodic" wandering.[2] He also extrapolated upon the idea that there had been "intrusions of wakefulness" into the defendant's sleep – a notion he had touched upon in his earlier testimony. Dr. Howsepian believed that Rodriguez essentially had a moment of clarity when he threw the statue at his father, and thus appreciated the nature of that particular decision. However, with respect to the conduct that formed the basis for the crimes of attempted murder and aggravated mayhem, Dr. Howsepian was of the opinion that Rodriguez did not understand the nature and quality of his behavior and/or was incapable of understanding the wrongfulness of his actions.

The prosecution offered testimony from two court-appointed psychiatrists. Drs. Luiz Velosa and Howard Terrell each opined that Rodriguez was sane when he committed the crimes, i.e., that he was capable of distinguishing between right and wrong, and understood the nature and quality of his actions. Dr. Terrell specifically ruled out the possibility that Rodriguez's behavior was attributable to some form of parasomnia.

The jury found Rodriguez was not legally insane at the time of the offenses.

Sentencing

Rodriguez was sentenced to life in prison with the possibility of parole based on the conviction of aggravated mayhem as alleged in Count 2. The trial court imposed the

_____

[2] Dr. Howsepian used the terms "nocturnal wandering" and "episodic wandering" interchangeably during the guilt phase. Only the latter term was used during the insanity phase.

9.

upper term of nine years for the attempted murder conviction, plus an additional three years for the admitted great bodily injury enhancement, and stayed the entire sentence on Count 1 pursuant to section 654. Rodriguez received 1,271 days of presentence custody and conduct credit against his sentence (see discussion, *infra*).

**DISCUSSION**

**Ineffective Assistance of Counsel**

<u>Background</u>

An unreported conference regarding jury instructions was held between the parties and the trial court prior to closing arguments in the guilt phase of the trial. When the conference was over, the trial court identified for the record the agreed-upon instructions. It was noted that the parties intended to use modified versions of CALCRIM Nos. 3425 and 3426 regarding unconsciousness and voluntary intoxication, respectively. The court went on to state: "And [CALCRIM No.] 3428 was suggested by the court. You're not requesting that, [defense counsel], because that's not consistent with your defense, correct?" Rodriguez's trial attorney replied, "That is correct." The record on appeal provides no further insight into why defense counsel chose not to use this particular instruction.

CALCRIM No. 3428 states, in pertinent part: "You have heard evidence that the defendant may have suffered from a mental (disease[,]/ [or] defect[,]/ [or] disorder). You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state, specifically: *<insert specific intent or mental state required, […] >*. If the People have not met this burden, you must find the defendant not guilty of *<insert name of alleged offense>*."

10.

CALCRIM No. 3428 is an optional pinpoint instruction designed to convey the information set forth in section 28, subdivision (a). (*People v. Ervin* (2000) 22 Cal.4th 48, 91 [referring to CALJIC No. 3.32].) Section 28 provides that evidence of mental disorders is admissible "'on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged,' a theory sometimes referred to as 'diminished actuality.' [Citation]. Section 28(a) bars evidence of the defendant's *capacity* to form a required mental state, consistent with the abolition of the diminished capacity defense.'" (*People v. Elmore* (2014) 59 Cal.4th 121, 139 (*Elmore*), original italics, fn. omitted.)

Defense counsel focused on the theory of unconsciousness during closing argument, emphasizing that a finding of unconsciousness would constitute a complete defense to all charges. Counsel alternatively urged the jury to consider the partial defense of voluntary intoxication in the event that it did not accept the opinions of Dr. Howsepian. Other portions of the closing argument challenged the logic behind the allegations of premeditation and deliberation, and addressed alternative defense theories such as heat of passion.

The jury was instructed on unconsciousness with the following modified version of CALCRIM No. 3425: "The defendant is not guilty of the charges if he acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. Someone may be unconscious, even though able to move. [¶] Unconsciousness may be caused by an altered sleep-like state. [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was conscious. If, however, based on all the evidence you have a reasonable doubt that he was conscious, you must find him not guilty."

The jury was also given instructions on voluntary intoxication as a partial defense to negate the element of specific intent, as well as instructions concerning perfect self-

11.

defense, imperfect self-defense, heat of passion, and the lesser included offenses of attempted voluntary manslaughter, simple mayhem, and battery with serious bodily injury.

Rodriguez claims he received constitutionally deficient representation as a result of his trial attorney's failure to argue a theory of diminished actuality during trial and to utilize the corresponding pattern instruction for such a defense, CALCRIM No. 3428.

Analysis

"'A criminal defendant is guaranteed the right to the assistance of counsel by both the state and federal Constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) "Construed in light of its purpose, the right entitles the defendant not to some bare assistance but rather to *effective* assistance."'" (*People v. Lucas* (1995) 12 Cal.4th 415, 436 (*Lucas*), original italics.) An appellant must establish two things in order to prevail on an ineffective assistance of counsel claim: (1) the performance of his or her attorney fell below an objective standard of reasonableness, and (2) prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Anderson* (2001) 25 Cal.4th 543, 569.)

The standard for evaluating the first prong of appellant's claim is extraordinarily deferential. "A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Gamache* (2010) 48 Cal.4th 347, 391.) On direct appeal, we "'will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 980.) This is a difficult burden to satisfy. (*Lucas*, *supra*, 12 Cal.4th at p. 437.)

Rodriguez's argument on this issue is two-fold. First, he claims it was unreasonable for his trial attorney to rely so heavily upon a theory of unconsciousness

12.

because Dr. Howsepian himself supposedly opined that he was "partially conscious" or "semi-conscious" during the incident, thus making diminished actuality "the most viable defense supported by Dr. Howsepian's testimony." As we will explain, this is a self-serving and myopic interpretation of what the expert actually said on the witness stand. Second, Rodriguez speculates that the decision not to argue or instruct the jury on the concept of diminished actuality was driven by a misunderstanding of the law insofar as his attorney failed to realize that diminished actuality is essentially a "'lesser included defense' of total unconsciousness" and mistakenly believed the defenses were mutually exclusive of one another.[3]

Dr. Howsepian did not postulate that Rodriguez was "partially conscious" or "semi-conscious" when he committed his crimes, at least not in a legal sense. He instead tried in vain to explain his understanding of the difference between being "legally unconscious" and what consciousness means to lay people and the scientific community. The expert alluded to this distinction at the beginning of his testimony with an example of how people are sometimes cognizant of what is happening in their dreams: "There are kinds of dreams that some people have experienced, called lucid dreams, in which they're fully conscious in their dream. They might think to themselves, 'Oh, wow, I'm dreaming. I can now do anything. I can fly,' et cetera. So a person can become quite conscious, even while asleep, but they don't have that consciousness. It's not a consciousness of their environment, so that's why they don't say they're awake during that time, even though they're fully self-conscious while sleeping."

Although Dr. Howsepian believed Rodriguez had some level of understanding in terms of what was happening the time of the 911 call, his testimony must be viewed in context. The transcript excerpt upon which appellant relies reads as follows:

_____

[3] We express no opinion on the merits of appellant's legal propositions concerning the relationship between diminished actuality and unconsciousness.

13.

"[Defense Counsel]: How do we reconcile that someone may have been unconscious, and you heard the 911 tape, and have heard what we heard, and what you're talking about as a parasomnia, how do we reconcile what we heard and what you're talking about?

"[Dr. Howsepian]: It's critically important, I think, that the word 'unconscious' be understood in these [sic] context, in a legal sense, the technical legal sense.

"[Prosecutor]: Your Honor, I'm going to object.

"[Trial Court]: Sustained. He can talk about his field, which is psychiatry, but not reach the legal conclusion.

"[Defense Counsel]: In your opinion, was Mr. Rodriguez, Jr. conscious of his actions at the time of the incident recorded somewhat on the 911 tape?

"[Dr. Howsepian]: The answer is he has clearly some recollection of what went on during the time, yes.

"[Defense Counsel]: So in your opinion, he was conscious or -

"[Prosecutor]: Objection, asked and answered.

"[Trial Court]: Overruled. You may answer.

"[Dr. Howsepian]: Again, when you ask me this question, this is in the usual sense of consciousness, in the psychiatric sense, not the legal sense, right?

"[Defense Counsel]: Well -

"[Dr. Howsepian]: This is very important, because -

"[Trial Court]: Please wait for a question."

Defense counsel did not pose another direct question about consciousness, but asked, "How do we reconcile someone suffering from parasomnia and the activities that

14.

we heard on the 911 tape?" This was followed by the final question and answer regarding a person's inability to make "deliberate principle[d] moral decisions" while they are experiencing a parasomnia.

The attribution of wrongful behavior to sleeping disorders and/or being in a state of sleep has traditionally been classified as an unconsciousness defense. (See *People v. Mathson* (2012) 210 Cal.App.4th 1297, 1315-1316.) "An unconscious act within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional." (*People v. Sedeno* (1974) 10 Cal.3d 703, 717, overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 165.) Unconsciousness is a complete defense to a criminal charge. (§ 26.) As previously discussed, the upshot of Dr. Howsepian's testimony was that Rodriguez was asleep when he committed the crimes, and that his actions were involuntary. Therefore, trial counsel's decision to rely on unconsciousness as the primary defense theory cannot be characterized as professional incompetence.

As for refusing the trial court's offer to instruct the jury with CALCRIM No. 3428, Rodriguez ignores the distinct possibility, if not probability, that his attorney eschewed the partial defense of diminished actuality in favor of an all-or-nothing strategy in relation to Dr. Howsepian's opinions and conclusions. Counsel could have reasoned that introducing the concept of diminished actuality carried the danger of confusing the jury, detracting from or undercutting the theory of unconsciousness, and/or inviting a compromise verdict. It is conceivable that to avoid such potential consequences, counsel employed the all-or-nothing strategy to help ensure that if the jury was in any way inclined to believe Dr. Howsepian's parasomnia explanations, it would completely exonerate Rodriguez. The closing arguments support this conclusion, since counsel told the jury not to consider any alternative defenses unless it had already rejected Dr. Howsepian's testimony.

15.

"Failure to argue an alternative theory is not objectively unreasonable as a matter of law." (*People v. Thomas* (1992) 2 Cal.4th 489, 531.) It is appellant's burden to affirmatively show his attorney's allegedly deficient performance "cannot be explained on the basis of any knowledgeable choice of tactics." (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.) The all-or-nothing strategy described above is a known tactic that is sometimes used by criminal defense lawyers for a variety of different reasons depending on the circumstances of their case. (See, e.g., *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140 & fn. 44; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1235; *People v. Lara* (1994) 30 Cal.App.4th 658, 674; *People v. Farrow* (1993) 13 Cal.App.4th 1606, 1618, fn. 14, ¶ 4.) Indulging as we must the strong presumption that Rodriguez's trial attorney had a rational tactical purpose for choosing to forgo arguing a theory of diminished actuality, we reject his ineffective assistance of counsel claim.

**Failure to Reinstruct with CALCRIM No. 226 at the Insanity Phase**

During the penalty phase the trial court instructed the jury with CALCRIM No. 226 ("Witnesses")[4] and CALCRIM No. 332 ("Expert Witness Testimony").[5] At the

---

[4] The CALCRIM No. 226 instruction stated: "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. [¶] In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony. Among the factors that you may consider are: How well could the witness see, hear, or otherwise perceive the things about which the witness testified? How well was the witness able to remember and describe what happened? What was the witness's behavior while testifying? Did the witness understand the questions and answer them directly? Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided? What was the witness's attitude about the case or about testifying? Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? How reasonable is the testimony when you consider all the other evidence in the case? Did other evidence prove or disprove any fact about which the witness

16.

insanity phase, the jury was again instructed with CALCRIM No. 332, but not with CALCRIM No. 226, presumably because the only testimony at this stage of the proceedings came from expert witnesses. The trial court solicited the parties' input on its decision to pare down the list of instructions previously used at the guilt phase, but neither the prosecution nor defense counsel objected to the omission of CALCRIM No. 226. On appeal, however, Rodriguez contends that the trial court's failure to reinstruct the jurors on general principles of witness credibility and believability constituted reversible error.

---

testified? Did the witness admit to being untruthful? [¶] Do not automatically reject testimony just because of inconsistencies or conflicts. Consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently. [¶] If you do not believe a witness's testimony that he or she no longer remembers something, that testimony is inconsistent with the witness's earlier statement on that subject. [¶] If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says. Or, if you think the witness lied about some things, but told the truth about others, you may simply accept the part that you think is true and ignore the rest."

**5** The CALCRIM No. 332 instruction stated: "Witnesses were allowed to testify as an expert and to give an opinion. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinions are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the experts' knowledge, skill, experience, training, and education, the reasons the experts gave for any opinions, and the facts or information on which the experts relied in reaching that opinion. You must decide whether information on which the experts relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence. [¶] An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the experts' opinion."

The California Supreme Court has addressed this issue in capital cases where instructions were provided during the guilt phase but not repeated during the penalty phase. "In general, the trial court need not repeat or highlight 'generic' guilt phase instructions on witness credibility at the penalty phase as long as the jury can properly infer that these instructions continue to apply." (*People v. Contreras* (2013) 58 Cal.4th 123, 167 (*Contreras*).) "Such is the case where the instructions are not limited by their terms to the guilt phase or contradicted by other advisements at the penalty phase." (*Ibid.*) We see no reason why this rule should not be applied here, since the guilt phase and the insanity phase were two components of the same trial. (*Elmore*, *supra*, 59 Cal.4th at p. 141 ["'The separation of the two stages of the bifurcated trial is solely for the purpose of keeping the issues of guilt and sanity distinct; for other purposes, the trial is regarded as single and continuing.'"], quoting 5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 795, p. 1227.)

In any event, the parties agree that if the trial court erred by failing to reinstruct the jurors with CALCRIM No. 226, the error should be evaluated for prejudice under the traditional *Watson*[6] standard. (See *People v. Carter* (2003) 30 Cal.4th 1166, 1219-1221 [failure to reinstruct on general principles at the penalty phase is not structural error]; *People v. Larsen* (2012) 205 Cal.App.4th 810, 830 [in the absence of federal constitutional error, improper omission of jury instructions is reviewed under the *Watson* standard].) Rodriguez's prejudice analysis focuses on a sentence in CALCRIM No. 226 which informs jurors that in evaluating a witness's testimony, they may consider "anything that reasonably tends to prove or disprove the truth or accuracy of that testimony." He argues that due to the trial court's failure to convey this message for a second time at the insanity phase, the jury likely believed it did not have "full latitude" to consider the accuracy of the experts' respective opinions based on anything and

---

[6] *People v. Watson* (1956) 46 Cal.2d 818, 836.

everything that could tend to prove or disprove their conclusions, including the relatively short amount of time the court-appointed experts spent working on the case (approx. 1-2 hours) in comparison to Dr. Howsepian (approx. 50 hours). We are not persuaded by this argument, nor do we perceive any likelihood that the jury would have adopted Dr. Howsepian's opinions on the issue of insanity but-for the omission of CALCRIM No. 226.

CALCRIM No. 332, which the jury did receive a second time, expressly states: "In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally." Although the jury no longer had its written instructions from the guilt phase, CALCRIM No. 226 was not, by its terms, limited to the guilt phase, nor were its guidelines contradicted by any of the insanity phase instructions. Therefore, we may presume the jury correctly understood that the general principles for evaluating the testimony of ordinary witnesses also applied to their evaluation of testimony provided by Dr. Velosa and Dr. Terrell. (Cf. *People v. Danielson* (1992) 3 Cal.4th 691, 723, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Wharton* (1991) 53 Cal.3d 522, 600; *People v. Brown* (1988) 46 Cal.3d 432, 460.)

Furthermore, making credibility determinations is "a task lay jurors would be expected to understand and perform in their daily lives." (*Contreras*, *supra*, 58 Cal.4th at p. 169.) Rodriguez attempts to distinguish credibility determinations from the process of assessing the believability of a witness's testimony, but his arguments fall well short of establishing prejudice. Assuming arguendo that the trial court erred by failing to reinstruct the jury with CALCRIM No. 226, we conclude it is not reasonably probable that Rodriguez would have received a more favorable verdict absent the alleged error.

**Miscalculation of Presentence Custody and Conduct Credits**

Respondent and appellant both correctly submit that the trial court miscalculated the presentence custody and conduct credits to which Rodriguez was entitled under

19.

sections 2900.5 and 4019. However, the parties disagree as to whether Rodriguez should have received an additional 50 or 51 days of credit. To resolve this dispute, we must determine how long Rodriguez was in "custody" within the meaning of section 2900.5, subdivision (a). For the reasons hereafter stated, we agree with respondent that the first day of actual custody was October 27, 2009, and that Rodriguez is entitled to an additional 50 days of credit against his prison sentence.

Background

Rodriguez was arrested in front of his father's home on October 26, 2009 at approximately 9:09 p.m. From there he was taken to the Clovis police station and placed in a holding cell or a similar type of "detention facility," which is the term that was used by Detective Ryan Swank during his trial testimony. Detective Swank retrieved Rodriguez from the detention facility at approximately 9:58 p.m. and brought him to an interview room that was also located inside of the police station. The first interview ended at around midnight when Detective Swank left the station to view the crime scene. He returned sometime after 1:00 a.m. on October 27, 2009 and proceeded to conduct his second interview with Rodriguez. The record implies that Rodriguez was booked into the Fresno County Jail later that day, and remained in custody at the jail until the time of sentencing.

Sentencing was originally scheduled for November 5, 2012, but did not take place until December 18, 2012. The probation report, which the trial court evidently relied upon in calculating Rodriguez's time credits, was not updated to reflect the additional days he spent in jail between the originally scheduled hearing date and the actual day of sentencing. Consequently, the trial court only gave him credit for time spent in custody between October 27, 2009 and November 5, 2012. This was determined to be 1,271 days (1,106 days of actual custody, plus 165 of conduct credit pursuant to sections 2933.1 and 4019). Rodriguez argues that his custody and conduct credits should have been calculated from October 26, 2009 through December 18, 2012.

20.

Analysis

A criminal defendant is entitled to credit against his or her sentence for all days spent in custody while awaiting trial and sentencing, up to and including the date when their sentence is imposed. (§ 2900.5, subd. (a); *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) A partial day spent in jail qualifies as a whole day of custody for purposes of calculating actual custody credits. (*People v. King* (1992) 3 Cal.App.4th 882, 886.) Section 4019 provides for additional presentence credits based on work time and good behavior, collectively referred to as "conduct credit," and specifies the rate at which such credit can be earned. (§ 4019, subds. (a), (b) & (c); *People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.) Section 2933.1 limits the availability of conduct credit to 15 percent of the actual period of confinement if the defendant has been convicted of a violent felony, including mayhem and attempted murder. (§§ 2933.1, subds. (a) & (c)); 667.5 subds. (c)(2) & (12).)

Pursuant to section 2900.5, credit for time served begins to accrue on the first day of custody, which in many cases will be the same day as the defendant's arrest. The statute, however, does not refer to the date of arrest but rather to the time "when the defendant has been in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or *similar residential institution*." (§ 2900.5, subd. (a), italics added.) Being arrested is generally synonymous with being taken into custody (§ 834), but case law holds that section 2900.5 distinguishes between "residential custody arrangements" and basic custodial detention. (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 919 (*Ravaux*).)

Rodriguez contends that he should have received custody credit for the time during which he was detained at the Clovis police station on the night of October 26, 2009. The same type of argument was considered and rejected in *Ravaux*, *supra*, a case that involved a defendant who was arrested by police at approximately 9:30 p.m. but was

21.

not booked into the county jail until 12:28 a.m. the next day. (*Ravaux*, *supra*, 142 Cal.App.4th at p. 917.) Applying standard rules of statutory construction, the Fourth District held that a defendant is not in custody within the meaning of section 2900.5 until he or she is processed into a jail or, as the statute indicates, a "similar residential institution." (*Id.* at pp. 919-921.) "The plain language of section 2900.5 addresses only residential custody arrangements and makes no mention of detention, seizure or arrest by the police as being the type of custody included in the calculation of custody credits." (*Id.* at p. 919.)

Rodriguez does not challenge the correctness of the *Ravaux* holding in his reply, but argues the "detention facility" at the Clovis police station fits within the type of custodial arrangements contemplated by section 2900.5. The record is lacking in evidence on this point, and we are not convinced that the holding area where he was detained for less than an hour before being taken to the interview room qualifies as the type of "residential" custodial setting described in the statute. It is appellant's burden to show that error occurred in the proceedings below, and he has not met his burden vis-à-vis the trial court's determination that the first day of actual custody was October 27, 2009.

The trial court did err by failing to include the time between November 5, 2012 and December 18, 2012 when it calculated Rodriguez's presentence custody and conduct credits. We will recalculate his credits under the applicable statutory authorities. (See *People v. Smith* (2001) 24 Cal.4th 849, 852-854 [unauthorized sentence may be corrected in the first instance on appeal].) Taking into account the extra day in 2012 for leap year, there were 1,149 days of actual custody between October 27, 2009 and December 18, 2012. With the 15% restriction imposed by section 2933.1, Rodriguez was entitled to receive 172 days of conduct credit. Accordingly, we modify the judgment to reflect 1,321 days of combined presentence custody and conduct credit against Rodriguez's sentence of life in prison with the possibility of parole.

**Errors in the Abstract of Judgment**

The abstract of judgment forms that were prepared in this case contain multiple errors. The form pertaining to Count 1 incorrectly states that Rodriguez was convicted of "attempted willful deliberate premeditated murder" pursuant to section 205. The abstract should instead reflect that he was convicted of attempted murder pursuant to sections 664 and 187, and should not contain any reference to willfulness, deliberation, or premeditation. The form pertaining to Count 2 does not recognize any presentence custody or conduct credits against the indeterminate sentence of life in prison with the possibility of parole. We order the preparation of an amended abstract to correct these mistakes. The amended abstract should include the modification to Rodriguez's presentence custody and conduct credits.

## DISPOSITION

Appellant's sentence is modified to reflect an additional 50 days of presentence custody and conduct credit, for a total of 1,321 days of credit against Rodriguez's sentence of life in prison with the possibility of parole in relation to the aggravated mayhem conviction under Count 2. The trial court is directed to prepare an amended abstract of judgment reflecting this modification. The amended abstract should further indicate that appellant was convicted of attempted murder under Count 1 pursuant to sections 664 and 187, and should not contain any reference to willfulness, deliberation, or

23.

premeditation. A copy of the amended abstract shall be forwarded to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

_____
Gomes, J.

WE CONCUR:

_____
Levy, Acting P.J.

_____
Cornell, J.