Filed 1/12/21  P. v. Leverette CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B292120 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA073933-01) |
| v. | |
| DANTE LEVERETTE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Chris R. Redburn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven E. Mercer, Michael C. Keller and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

One shooter, two shots, three police officers, only one of whom was hit: three convictions for attempted murder, three for assaulting a peace officer with a firearm, and one for possession of a firearm by a felon. We affirm one of the three convictions for attempted murder, all the convictions for the remaining offenses, all the firearm enhancements, almost all the other enhancements, and remand for resentencing.

# FACTUAL AND PROCEDURAL BACKGROUND

A.     *A Jury Convicts Dante Leverette of Attempting To Murder Three Police Officers and Assaulting Them with a Firearm*

A jury convicted Dante Leverette on three counts of attempted willful, deliberate, and premeditated murder, three counts of assault with a semiautomatic firearm on a peace officer, and one count of possession of a firearm by a felon. The jury also found true the allegations Leverette personally and intentionally used and discharged a firearm causing great bodily injury or death, within the meaning of Penal Code section 12022.53, subdivisions (b), (c), (d),[1] and section 12022.5, subdivisions (a) and (d). The jury also found true the allegation Leverette was on bail when he committed the offenses. In a separate proceeding, Leverette admitted he served two prior prison terms within the meaning of section 667.5, subdivision (b), one for deterring, preventing, or resisting by means of threat, force, or violence an

---

[1]     Undesignated statutory references are to the Penal Code.

2

executive officer performing his or her duty, and one for possessing marijuana for sale.

On the attempted murder convictions, the trial court sentenced Leverette to three consecutive terms of 15 years to life, plus 25 years to life under section 12022.53, subdivision (d). On the conviction for possession of a firearm by a felon, the court sentenced Leverette to a consecutive term of three years (the upper term), plus two years for the on-bail enhancement and two years for the two prior prison term enhancements. The court stayed under section 654 imposition of sentences on the three convictions for assault on a peace officer with a semiautomatic firearm.

> B. *Officer Benito Seli Responds to a Traffic Stop in Progress and Is Shot*

On May 18, 2010, at 1:30 a.m., Santa Monica Police Officer Benito Seli was assigned to back up Officer Kevin McInerney, who was conducting a traffic stop near the intersection of Lincoln and Pico Boulevards. As Officer Seli drove south on Lincoln Boulevard and crossed Pico Boulevard, he saw Officer McInerney's patrol car parked across the street, facing north, at an angle behind a black sports utility vehicle. Officer McInerney had the light on his patrol car illuminated and both its spotlights shining on the SUV. Officer Seli was able to see a driver and a passenger in the SUV. He also observed the patrol car of Sergeant Robert Hernandez, who was there as "a courtesy backup for Officer McInerney," parked behind Officer McInerney's car. There were no other officers yet at the scene.

Officer Seli parked around the corner on Bay Street to avoid blocking the intersection. As he walked toward Lincoln

3

Boulevard, Sergeant Hernandez approached him and said Officer McInerney was going to start an investigation for driving under the influence.  Officer Seli "assumed the role of cover officer," which involved "maintaining situational awareness and offering protection for everybody on scene."

Officer Seli saw Officer McInerney walk to the driver's side of the SUV and tell the driver to get out of the car and go to the sidewalk on the east side of Lincoln Boulevard.  Officer McInerney used his flashlight to direct the driver where to stand on the sidewalk.  The driver, David Dearth, complied.  As Officer McInerney "began asking the typical questions associated with a DUI" investigation, Officer Seli approached the rear of the SUV and walked toward the passenger side to begin his "interaction with that individual."  When Officer Seli was seven to 10 feet from the SUV, with his flashlight in his left hand to keep his gun hand free, he saw the passenger, Leverette, quickly open the door of the SUV, "get out in a very deliberate and crouched manner," wedge himself against the door, and extend his arm holding a gun, slanted at a 45-degree angle.  Officer Seli found himself "staring down the barrel of a two-toned gun" that looked like a Smith & Wesson Sigma he used to have.  Within two to three seconds, Leverette fired two shots at Officer Seli.

After the first shot, Officer Seli felt pain and a burning sensation in the area of his right lower abdomen and hip.  He testified that both shots were generally in his direction and that he thought the second shot went over his left shoulder.  Officer Seli took his gun out of his holster and fired two shots at Leverette in self-defense.  In pain, he retreated behind the back of the SUV for cover, saw Officer McInerney and Sergeant Hernandez shoot at Leverette, and called for assistance.

Leverette fled north on Lincoln Boulevard. Other officers arrived and tended to Officer Seli until paramedics came and took Officer Seli to the hospital.

C.    *Sergeant Robert Hernandez Arrives at a Traffic Stop To Observe and Assist*

Sergeant Robert Hernandez was a training sergeant who supervised probationary officers assigned to his shift. As a supervisor, he observed probationary officers in the field, reviewed their reports, and wrote quarterly evaluations of their performance. On May 18, 2010 Officer McInerney was one of the probationary officers assigned to Sergeant Hernandez's shift. Sergeant Hernandez had not previously worked with Officer McInerney, and he "was specifically listening for calls that [Officer McInerney] was assigned to" so he could observe Officer McInerney take an enforcement action.

At 1:30 a.m. Sergeant Hernandez heard Officer McInerney call in a traffic stop on Lincoln Boulevard, and Sergeant Hernandez decided to respond to the call and observe. On arriving, he parked behind Officer McInerney's car.

Officer McInerney told Sergeant Hernandez that he had stopped the SUV for driving without headlights, that he smelled alcohol on the driver's breath, and that he was going to bring the driver out of the SUV to conduct a DUI investigation. Officer McInerney did not tell Sergeant Hernandez there was another person in the SUV. When Officer Seli arrived a few minutes later, Sergeant Hernandez told him Officer McInerney, who had returned to the driver's side of the SUV, was going to conduct a DUI investigation. Sergeant Hernandez did not approach the

5

SUV, but remained back to observe how Officer McInerney conducted the investigation.

Sergeant Hernandez saw Officer McInerney bring the driver, Dearth, to the east sidewalk of Lincoln Boulevard, question him, and begin to administer a field sobriety test. Officer McInerney shined his flashlight on a spot on the sidewalk and told Dearth to stand at that spot. Sergeant Hernandez returned to his car to retrieve his flashlight when he heard someone say, "Oh, shit." He looked back and saw the passenger door of the SUV open and Leverette, "half-crouched, half-out of" the SUV, lean with his arm extended and a gun in his hand. According to Sergeant Hernandez, Leverette was pointing the gun east or southeast, "definitely not in [his] direction but pointed in another direction," while Officer McInerney and Dearth were on the sidewalk to the east. Sergeant Hernandez heard one (according to his testimony at trial) or two (according to his testimony at the preliminary hearing) gunshots. Sergeant Hernandez drew his handgun and, as he moved to his left to take cover behind Officer McInerney's patrol car, fired four or five times at Leverette. He did not know where Officer Seli or Officer McInerney was at this point, but he knew they were not in front of him when he fired at Leverette. Sergeant Hernandez never saw Leverette point the gun or aim at him, and he believed Leverette's shot "was pointed at Officer McInerney and Mr. Dearth."

Leverette fled up Lincoln Boulevard. Sergeant Hernandez chased Leverette but lost him when he turned east on Pico Boulevard. Sergeant Hernandez returned to Lincoln Boulevard and discovered Officer Seli had been shot and was bleeding "a great deal."

Several hours later a team of 60 officers searched for Leverette and ultimately found him hiding in a nearby alley. As Leverette tried to escape, officers from a Special Weapons and Tactics Team shot him and arrested him after he fell to the ground. Sergeant Hernandez identified Leverette in a hospital emergency room as "the person that had fired on myself and Officer Seli and McInerney from inside" the SUV. Officers later found Leverette's gun, a .40-caliber semiautomatic handgun, hidden near the alley.

D.    *Officer Kevin McInerney Makes a Traffic Stop*

On May 18, 2010 Officer Kevin McInerny had been a rookie officer with the Santa Monica Police Department for six months. At 1:30 a.m. he was driving south on Lincoln Boulevard when he saw an SUV driving north with its headlights off. He made a U-turn, followed the SUV, and pulled it over. He parked his patrol car at an angle behind the SUV as a safety precaution to protect himself from cars coming up the street and pointed his spotlights at the SUV. Officer McInerney approached the car and saw two people in it. He obtained Dearth's driver's license and a car rental agreement and began asking him questions. Most of the officer's attention was on Dearth, to whom he directed most of his questions, but he asked both occupants if they were on probation or parole.

Officer McInerney heard on the radio that Officer Seli was the assigned backup officer and that Sergeant Hernandez was also going to respond. When they arrived, Officer McInerney told them he was going to "pull the driver out," but he did not say there was a passenger in the car. Officer McInerney returned to the SUV, told Dearth to get out, and directed him to the

7

sidewalk. Officer McInerney believed that Officer Seli, as the backup officer, would contact the passenger to get information about him.

Standing with Dearth on the sidewalk, Officer McInerney saw Leverette open the passenger door quickly, jump out, point a gun to Officer McInerney's left (where Officer Seli and Sergeant Hernandez were), and fire two shots. Officer McInerney responded by firing seven shots at Leverette as he ran away. Officer McInerney then told Dearth to get on the ground. He did not know at that time where Officer Seli was, but he knew Officer Seli was not in front of him as he shot at Leverette. After he handcuffed Dearth and put him in a patrol car, Officer McInerney saw Officer Seli had been shot and was bleeding from his lower abdomen. Officer McInerney identified Leverette at trial as the person who shot Officer Seli.

> E. *David Dearth Goes Looking for Drugs and Finds a Shootout*

David Dearth, a former professional bodybuilder, the 1989 Mr. Universe, and a recovering drug addict, was in Los Angeles in May 2010 to work on a celebrity training video and a potential television show. The producers of the show put him up in a Marina Del Rey condominium and rented him an SUV.

On the evening of May 17-18, 2010 Dearth was watching television in the condominium when he decided to go to a bar. He had two beers and a shot of German liquor or schnapps. He got back in his car and drove to a neighborhood he knew to look for drugs. He eventually found someone, Leverette, willing to sell him some. Leverette got in Dearth's SUV wearing a hat and a red banana across his face and showed Dearth several rocks of cocaine. Leverette told Dearth to drive to a gas station, where

8

Dearth bought a couple of roses.[2]  When he drove away from the gas station, Dearth forgot to turn on the SUV's headlights.

As he traveled north on Lincoln Boulevard, Dearth saw red and blue police lights from Officer McInerney's patrol car in his rear view mirror.  Leverette said to Dearth, "You have a cop following you."  Dearth turned on his car's headlights, and the officer pulled the SUV over just south of Pico Boulevard.  Leverette said, "Be cool.  We weren't doing nothing wrong.  You just had your lights off."  Officer McInerney approached the car and asked Dearth if he had been drinking.  After Dearth gave Officer McInerney his driver's license and the SUV's registration, the officer returned to his patrol car.  Leverette asked Dearth if he could see how many police officers there were behind them.  Dearth said it looked like there was only one officer, but he was not sure.

Officer McInerney returned to the SUV and asked Dearth and Leverette a few questions.  Officer McInerney told Dearth to get out of the SUV and go to the sidewalk for a field sobriety test.  Leverette remained in the car, while Officer McInerney took Dearth 10 feet from the SUV.  Dearth saw two other officers had arrived on the scene and were in the street, not on the sidewalk.

Suddenly, Officer McInerney stopped questioning Dearth and yelled, "Get back in the car."  Dearth looked at the SUV and saw Leverette shooting a gun.  Dearth heard someone say, "Gun, gun," then heard multiple gunshots.  Dearth stood on the sidewalk watching, and then covered his head with his hands.  It appeared to Dearth that Leverette was aiming the gun toward him, although the gun "was moving around."

---

[2]     People using drugs commonly use the glass tubes that hold the roses to smoke the drugs.

9

Dearth saw Leverette run north on Lincoln Boulevard, and Officer McInerney forced Dearth down to the ground.  One of the officers asked, "Is everyone okay?" and the officer who had been shot said, "No, I'm hit.  I'm hit.  It went under my vest."  Officers put Dearth into the back of a police car.

## DISCUSSION

A.    *Substantial Evidence Supported Only One of Leverette's Three Convictions for Attempted Murder*

Leverette does not challenge his conviction for the attempted murder of Officer Seli for lack of substantial evidence. He does argue, however, substantial evidence did not support his convictions for the attempted murders of Sergeant Hernandez and Officer McInerney.  Leverette argues substantial evidence did not support the jury's finding that he "harbored an express intent to kill either Hernandez or McInerney."

1.    *Applicable Law*

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]  We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]  In so doing, a reviewing court ""presumes in support of the judgment the

10

existence of every fact the trier could reasonably deduce from the evidence.'"'" (*People v. Morales* (2020) 10 Cal.5th 76, 88; see *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 626.)

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]  When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*People v. Canizales* (2019) 7 Cal.5th 591, 602; accord, *In re Rayford* (2020) 50 Cal.App.5th 754, 767-768; see *People v. Perez* (2010) 50 Cal.4th 222, 230 (*Perez*) ["'"[g]uilt of attempted murder must be judged separately as to each alleged victim"'"].) "'"The mental state required for attempted murder has long differed from that required for murder itself.  Murder does not require the intent to kill.  Implied malice—a conscious disregard for life—suffices." [Citations.]  In contrast, "[a]ttempted murder requires the specific intent to kill . . . ."'" (*Perez*, at p. 229.)  The "'"act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .'"'" (*Id.* at p. 230; see *People v. Smith* (2005) 37 Cal.4th 733, 742 ["the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"].)

## 2. *Substantial Evidence Supported Only One Attempted Murder Conviction*

The evidence Leverette fired at Officer Seli at a range of seven to 10 feet was substantial evidence he intended to kill that officer and thus acted with express malice. As stated, Leverette does not argue otherwise. Substantial evidence, however, did not support the jury's finding Leverette intended to kill Sergeant Hernandez or Officer McInerney. Officer McInerney (the gun was aimed "off to my left") and Sergeant Hernandez ("it was definitely not pointed in my direction") testified Leverette did not shoot at them. Leverette fired only two shots, both of them in Officer Seli's direction: one hit Officer Seli and the other lodged in the right rear panel of the SUV, near the taillight. Neither Sergeant Hernandez nor Officer McInerney was in those locations when Leverette fired the two shots.[3] There was no evidence Leverette intended to kill anyone other than Officer Seli. Although, as the People point out, "a single shot may support multiple convictions if the victims were very close together," the three officers here were not very close together.

The People assert "Officer Seli testified that [Leverette] shot him, and then deliberately changed his aim to shoot the other officers." That's not quite what Officer Seli said. He testified: "The second shot that was fired was over my left shoulder, which is where—I am right about here by the door, and

---

[3]    The criminologist who removed the second bullet from the SUV testified that, had the SUV not been "in the way," the bullet was heading toward Officer McInerney's car. Sergeant Hernandez, as discussed, was not there; he was walking back to his car to get his flashlight when Leverette fired the two shots at Officer Seli.

as Officer McInerney and Sergeant Hernandez were right about here . . . and it would have been over my left shoulder. It was two deliberate thrusts, two rounds, one for me and one aimed at those two officers." But Officer Seli also testified Leverette fired the two shots at him. And the second shot did not go, and could not have gone, over Officer Seli's left shoulder; it hit the right rear panel of the SUV and lodged near the taillight. Unless Officer Seli was lying on the pavement (and he was not), it was physically impossible for the shot to have gone over his left shoulder. (Cf. *People v. Gomez* (2018) 6 Cal.5th 243, 281 ["'[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact' [citation] in the 'absence of patent falsity, inherent improbability, or other reason to question [the testimony's] validity'"]; *People v. Reed* (2018) 4 Cal.5th 989, 1006 [we do not question a witness's credibility "when considering sufficiency of the evidence so long as the witness's testimony is not inherently improbable"]; *People v. Young* (2005) 34 Cal.4th 1149, 1181 ["unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].)

The Supreme Court's decision in *Perez*, *supra*, 50 Cal.4th 222 confirms that substantial evidence to support Leverette's convictions for the attempted murders of Sergeant Hernandez and Officer McInerney was lacking here. In *Perez* the defendant, without targeting any specific individual, fired one shot at a group of eight people, seven of whom were police officers, hitting one of the officers in the hand and severing his finger. The jury convicted the defendant on eight counts of attempted premeditated murder. (*Id.* at p. 224.) The Supreme Court held the evidence was sufficient to sustain only one of the eight

13

convictions for attempted premeditated murder.  (*Id.* at p. 225.)
The Supreme Court stated that, "where the shooter
indiscriminately fires a single shot at a group of persons with
specific intent to kill *someone*, but without targeting any
particular individual or individuals, he is guilty of a single count
of attempted murder."  (*Ibid.*)  The Supreme Court emphasized
that, "in order for defendant to be convicted of the *attempted*
murder of each of the [eight people] in the group into which he
fired the single shot, the prosecution had to prove he acted with
the specific intent to kill each victim."  (*Id.* at p. 230.)  The
Supreme Court held there was "no evidence that defendant knew
or specifically targeted any particular individual or individuals in
the group of officers he fired upon," no evidence "he specifically
intended to kill two or more persons with the single shot," and
"no evidence defendant specifically intended to kill two or more
persons in the group but was only thwarted from firing off the
required additional shots by circumstances beyond his control."
(*Id.* at pp. 230-231, fns. omitted; see *People v. McCloud* (2012)
211 Cal.App.4th 788, 806 ["the targeting of [one] individual
cannot be the basis for convicting [the defendant] of the
attempted murders of *other* individuals—the doctrine of
transferred intent 'does not apply to an inchoate crime like
attempted murder'"].)

Here, of course, there was substantial evidence Leverette
intended to kill a particular individual: Officer Seli.  But, as in
*Perez*, there was no evidence that Leverette specifically targeted
Sergeant Hernandez or Officer McInerney, that he specifically
intended to kill them both with the second shot, or that he

14

intended to kill them but was thwarted by the circumstances.[4] Sergeant Hernandez and Officer McInerney were not close enough to Officer Seli or to each other for Leverette to have intended to kill two or more of them with one shot. (See *People v. McCloud*, *supra*, 211 Cal.App.4th at p. 800 ["Here, as in *Perez*, 'the evidence is insufficient to establish that defendant[s] acted with the intent to kill two or more individuals' per shot fired."].) Under the facts of this case, firing two shots at one officer among three on the scene did not support more than one conviction for attempted murder.[5]

---

[4]     The People argue that "circumstances may have prevented [Leverette] from firing as many times as he had intended" and that there was substantial evidence Leverette "intended to commit murder, but was thwarted instead of completing his plan." To the extent Leverette was attempting to kill Officer Seli, the People are correct: Return fire from the officers may have prevented Leverette from firing more than two shots at Officer Seli. But there was no evidence Leverette was executing a plan to kill the other two officers when they began firing at him.

[5]     *People v. Sánchez* (2016) 63 Cal.4th 411, cited by the People, is distinguishable. In that case the victim "testified that defendant placed his finger on the trigger when he pointed the gun at him and then, when he realized the gun was empty, made a gesture to change the clip." (*Id.* at p. 457.) There was no evidence Leverette engaged in any similar conduct toward Sergeant Hernandez or Officer McInerney.

15

B.     *Substantial Evidence Supported All Three Convictions for Assault on a Peace Officer*

But it did support three convictions for assault on a peace officer.  Leverette contends that, "[b]ecause he fired only two shots, [he] did not equip himself with sufficient means to assault three individuals with a weapon."  Although Leverette does not identify which of the three assault convictions he is challenging (Seli, Hernandez, or McInerney), he contends that he "never had the present ability to assault three individuals" and that "the convictions on one of the assault counts must be reversed."  These contentions fail.

Section 245, subdivision (d)(2), provides that a defendant who "commits an assault upon the person of a peace officer . . . with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer . . . engaged in the performance of his or her duties, when the peace officer . . . is engaged in the performance of his or her duties," is guilty of a felony.  To establish a violation of section 245, "among the elements that must be proven are those of assault.  This includes demonstrating that the defendant had the 'present ability . . . to commit a violent injury.'  [Citations.]  To have a 'present ability,' there must be threat of "'a present, and not a future injury.'" [Citation.]  However, immediacy is not required.  [Citation.] '[W]hen a defendant equips and positions himself to carry out a battery, he has the "present ability" required . . . if he is capable of inflicting injury on the given occasion, *even if some steps remain to be taken*, and even if the victim or the surrounding circumstances thwart the infliction of injury.'" (*People v. Nguyen* (2017) 12 Cal.App.5th 44, 48, fn. omitted.)  For the crime of assault, "'immediately' does not mean 'instantaneously.'  It

16

simply means that the defendant must have the ability to inflict injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*People v. Chance* (2008) 44 Cal.4th 1164, 1168, fn. omitted.) Unlike the crime of attempted murder, the crime of "assault is a general intent crime" and "does not require a specific intent to injure the victim." (*People v. Hernandez* (2011) 51 Cal.4th 733, 747.)

Leverette had the means and present ability to violently injure all three officers. He had his semiautomatic firearm out and was shooting in the general direction of the officers, and specifically at one of them. Although there was no substantial evidence he shot at more than one officer, he certainly had the present ability to do so. (See *People v. Chance*, *supra*, 44 Cal.4th at p. 1168 ["present ability element of assault . . . is satisfied when 'a defendant has attained the means and location to strike immediately'"]; *In re Raymundo M.* (2020) 52 Cal.App.5th 78, 89 [an assault with a deadly weapon can occur even if the defendant does not use the weapon].) This is true even though Sergeant Hernandez took cover behind Officer McInerney's patrol car and all three officers returned fire. (*Chance*, at p. 1168; see *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1346-1347 [crime of assault "may be established even where the victim took effective steps to avoid or prevent injury"].) Indeed, the Supreme Court in *Perez, supra,* 50 Cal.4th 222, after holding the defendant in that case could only be convicted of one count of attempted murder, stated: "Defendant's act of endangering the lives of each individual in the group at which he fired the shot will not go

17

unpunished. He was properly convicted of [eight] counts of assault with a semiautomatic firearm . . . ." (*Id.* at pp. 233-234.) Substantial evidence supported Leverette's three convictions for assault with a semiautomatic firearm on a peace officer.

C.   *The Trial Court Did Not Err in Refusing To Give an Instruction on Destruction of Evidence*

Leverette argues the trial court violated his due process rights by refusing to give an instruction he proposed that would have told the jury it could consider, in evaluating the prosecution's case, whether the Santa Monica Police Department improperly failed to preserve the SUV as evidence by returning it to the rental company five days after the shooting. Leverette also argues the trial court erred in not giving similar instructions sua sponte on the prosecution's destruction of, or failure to preserve, a videotape of the shooting taken from a gas station across the street and recordings of the incident from the three police cars' dashboard cameras or "dash cams."[6] Leverette argues that "at a minimum the jury should have been instructed that the police destroyed or lost the evidence from the [SUV] and the [gas station] video, and failed to follow procedure which would have produced police cam footage of the events in this case. The jury should be instructed that it may rely on this information to draw inferences against the prosecution's case, including but not

_____

[6]   Leverette argued in his opening brief that any failure by his trial counsel to request these instructions was ineffective assistance of counsel. In his reply brief, however, Leverette withdrew this argument and argued only that the trial court erred in failing to give the instruction his trial counsel requested on failure to preserve the SUV.

18

limited to who fired first, who shot Seli, and whether the officers were telling the truth in their description of the encounter."

1.      *The Court Did Not State It Would Give an Instruction on Destruction of Evidence*

Leverette's first argument is that the trial court erred in not giving these instructions because a judge hearing pretrial matters and the judge who presided over the trial both "indicated that they would give jury instructions on the prosecution's destruction of evidence . . . ."  But that's not what happened.

Leverette is correct that the issue whether the court would instruct the jury on destruction of evidence arose several times before and during trial.  But no judge ever ruled he (the pretrial judge) or she (the trial judge) would give such an instruction.  In April 2015 Leverette filed a motion to dismiss based on the prosecution's failure to preserve the SUV.  The court denied the motion to dismiss.  After granting Leverette's request that the court review a Santa Monica Police Department manual on preserving and maintaining evidence, the court reviewed the manual and affirmed its order denying Leverette's motion to dismiss.  In denying the motion again, the court stated:  "I'm leaving the door open for the defense in terms of perhaps an instruction they certainly would be able to make.  They are not precluded from making reference to the fact that . . . the car was not preserved for them to conduct their own analysis.  And the wording of that remains to be seen."  The court did not say that it would give an instruction on destruction of evidence, only that it was not precluding such an instruction and that the court would have to review the proposed language of the instruction.

19

Leverette concedes as much, stating in his reply brief only that the pretrial judge said "he would be open to such an instruction."

During the trial, counsel discussed the jury instructions with the court. The trial court asked counsel for Leverette if he wanted to request a "pinpoint instruction," and counsel stated he wanted an instruction on destruction or loss of evidence. The court stated it had reviewed the record regarding Leverette's motion to dismiss because the court "thought it was kind of odd that a court would order that a jury instruction would be given when that court wasn't the trial court." The trial court observed that the pretrial court made a finding Leverette would be allowed to refer to the police department's disposal, after only five days, of the SUV, but "it did not say [Leverette] was going to get a jury instruction that they destroyed the evidence." When counsel for Leverette stated he "understood it to be . . . a jury instruction," the trial court stated, "Your understanding is misplaced." The trial court did not say that it would give an instruction on destruction of evidence, only that Leverette could submit one. Leverette concedes as much, stating in his reply brief only that the trial judge "indicated that the defense should suggest such an instruction."

Counsel for Leverette ultimately submitted the following proposed instruction: "During the trial you received evidence that the Santa Monica Police Department did not preserve the [SUV] as evidence, but instead released it before the defense had an opportunity to inspect it. You may consider this fact when evaluating the truthfulness of the prosecution's allegations in this case." The trial court denied the request to give the instruction, ruling no one testified the Santa Monica Police Department had violated its policy on preserving evidence,

although the court stated Leverette could "argue that, because the . . . Santa Monica Police Department determined or decided to give the car back to [the rental company], that his expert was not allowed to go ahead and do their own evaluation of the car. At this point, I don't see any evidence that it was in violation of policy, because nobody got up here and testified to that."

2. *Leverette Did Not Show He Was Entitled to His Proposed Instruction on Failure To Preserve the SUV, and the Trial Court Did Not Have a Sua Sponte Duty To Instruct on Failure To Preserve the Video or Dash Cam Recordings*

Under *California v. Trombetta* (1984) 467 U.S. 479 [104 S.Ct. 2528, 81 L.Ed.2d 413] and *Arizona v. Youngblood* (1988) 488 U.S. 51, 57 [109 S.Ct. 333, 102 L.Ed.2d 281], "law enforcement agents have a constitutional duty to preserve evidence, but that duty is limited to 'evidence that might be expected to play a significant role in the suspect's defense.' [Citation.] To reach this standard of 'constitutional materiality,' the 'evidence must both possess an exculpatory value that was apparent before [it] was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' [Citations.] [¶] The defendant bears a higher burden to establish a constitutional violation when 'no more can be said' of the evidence 'than that it could have been subjected to tests, the results of which might have exonerated the defendant.' [Citation.] In such cases, 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' [Citations.] The

21

assessment of bad faith 'must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" (*People v. Flores* (2020) 9 Cal.5th 371, 394; see *People v. Carrasco* (2014) 59 Cal.4th 924, 962.)

If a trial court determines there has been a due process violation, the court has "'a large measure of discretion in determining the appropriate sanction that should be imposed because of the destruction of discoverable records and evidence.'" (*People v. Yeoman* (2003) 31 Cal.4th 93, 126; see *People v. Jenkins* (2000) 22 Cal.4th 900, 951 ["courts have broad discretion in determining the appropriate sanction for discovery abuse"].) In the absence of any due process violation, however, the trial court does not have to give a jury instruction on the destruction of evidence. (*People v. Flores*, *supra*, 9 Cal.5th at p. 397; see *People v. Cook* (2007) 40 Cal.4th 1334, 1351 [trial court does not have to give an instruction allowing the jury "to draw inferences more favorable to the defense, based on the prosecution's failure to preserve . . . evidence," where "no bad faith failure to preserve the evidence [is] shown"]; *People v. Cooper* (1991) 53 Cal.3d 771, 811 ["[a]lthough an adverse instruction may be a proper response to a due process violation," where there is "no such violation," the trial court is "not required to impose *any* sanction, including jury instructions"].)

The trial court did not abuse its discretion in denying Leverette's request for a destruction of evidence instruction relating to the SUV. Leverette does not explain whether or how the return of the SUV to the rental company, even if it violated department policy, deprived him of exculpatory evidence. He does state that the "car was not available for analysis by the defense" and that an "examiner could look for bullet impacts,

22

evidence of the direction of bullets, the bullet holes," but he does not explain how such an examination might have exonerated or otherwise helped him. Leverette also states that the SUV "had bullet holes and bullets in it that were important to a reconstruction of the events in this case," but he does not argue or explain how examining the bullets and bullet holes would have helped his defense. And he asserts he "disputed the very question raised by the omitted instruction—whether the destroyed evidence would vindicate him"—but he does not say how that evidence would have helped vindicate him. As the People correctly state, "There was no requirement that law enforcement maintain possession of the SUV indefinitely and no reason to believe returning the SUV had destroyed any potentially exculpatory evidence." Therefore, Leverette had to show the police acted in bad faith. (See *People v. Flores*, *supra*, 9 Cal.5th at p. 394; *People v. Carrasco*, *supra*, 59 Cal.4th at p. 962; *People v. Farnam* (2002) 28 Cal.4th 107, 166.)

He did not. The Santa Monica Police Department impounded the SUV as evidence. Representatives from the rental company went to the police station to assist the criminologist from the crime laboratory in removing the bullet from the rear panel of the SUV and to make sure that, when he removed the bullet, he caused the SUV as little damage as possible. The police returned the SUV after five days because the police had completed their ballistics examination, the rental company wanted its car back, and the city did not want to incur liability for keeping it any longer.[7] (See *People v. Carrasco*,

---

[7] The department had a policy that property booked in evidence and stored in the property room could only be released by property unit staff upon written authorization from the

23

*supra*, 59 Cal.4th at p. 962 ["failure of the police to remove" a can of hair spray with the defendant's fingerprints on it from a car "before the car was returned to its owner did not constitute a violation of defendant's right to due process of law"].) Because Leverette has not established a due process violation relating to the return of the SUV, he has not shown he was entitled to his proposed instruction on destruction of evidence. (See *People v. Flores*, *supra*, 9 Cal.5th at p. 397; *People v. Cooper*, *supra*, 53 Cal.3d at p. 811.)

Finally, trial counsel for Leverette did not request an adverse inference instruction on destroying or failing to preserve the gas station video or the dashboard camera recordings, and Leverette does not argue on appeal the court had a sua sponte duty to give such an instruction.[8] (See *People v. Medina* (1990) 51 Cal.3d 870, 894.) Leverette does assert that, because "the trial court refused to give the narrower instruction, it would have been futile for trial counsel to submit an even broader instruction that covered the [gas station] video and the police cams as well." The record, however, does not support that assertion.

criminal investigations unit or the city attorney's office, but that policy did not apply to the release of vehicles.

[8] Leverette argued in his opening brief the trial court had a sua sponte duty to give an instruction on destruction of evidence, but withdrew that argument in his reply brief. In particular, Leverette stated in his reply brief that his argument "an instruction should be given sua sponte" was "hereby withdrawn and should not be considered by the Court" and that the People's forfeiture argument "regarding a sua sponte duty was rendered irrelevant by trial counsel's submission of and the trial court's denial of the admonition."

24

In discussing whether to give an instruction on destroying or failing to preserve evidence, the court and counsel addressed all three pieces of evidence separately—the SUV, the gas station video, and the dashboard cameras. At one point the trial court even asked counsel for Leverette to bring the proposed pinpoint instruction regarding the destruction of the gas station video, and counsel said he would bring it the following Monday. In addition, the issues concerning the three pieces of evidence were different: The SUV issue had to do with returning the vehicle to the rental company at its request, the gas station issue involved a video recording of the incident from across the street that may have been damaged or lost, and the dashboard camara issue concerned the functionality and capability of the recording instruments on the three officers' patrol cars.[9] There was no reason to think the court would make the same ruling on three different instructions

---

[9] Indeed, with respect to the dashboard cameras, Leverette argues not that the prosecution destroyed or failed to preserve any evidence, but that the police officers failed to create the evidence in the first place. He complains that Officer McInerney's dashboard camera, though recording, did not capture the entire incident because, as discussed, he parked his patrol car at an angle for safety reasons.[*] Leverette also claimed that Sergeant Hernandez, who did not turn on his camera because he was not the officer taking the enforcement action and went to the scene only to observe Officer McInerney, and that Officer Seli, who did not turn on his camera because he was parked around the block, violated department policy by not turning on their dashboard cameras.

> [*] But it did record some of the incident, including Officer Seli's flashlight beam as he approached the SUV, the movement of the SUV when Leverette jumped out, and Officer Seli mouthing some words and retreating after he was shot.

25

concerning these three very different requests for an adverse-inference jury instruction.  (See *People v. Farrow* (1993) 13 Cal.App.4th 1606, 1618, fn. 14 [defendant's contention "it would have been futile for him to have requested instructions" was "plainly contradicted by the record"]; *People v. Garcia (*1986) 178 Cal.App.3d 814, 823 ["There was no reason for defendant to believe the court would have refused a limiting instruction had he suggested one, as the court had earlier invited him to do."].)

> D.     *The Two Prior Prison Term Enhancements Must Be Stricken*

When the trial court sentenced Leverette in August 2018, section 667.5, subdivision (b), required the court to impose a one-year sentence enhancement for each true finding "the defendant had served a separate prior prison term and had not remained free of custody for at least five years." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 681.)  Senate Bill No. 136, which was enacted on October 8, 2019 and became effective January 1, 2020, amended section 667.5, subdivision (b), by limiting the applicability of the one-year prior prison term enhancement to those defendants who served a prior prison sentence for a sexually violent offense, as defined in Welfare and Institutions Code section 6600, subdivision (b).  (Stats. 2019, ch. 590, § 1; see *People v. Griffin* (2020) 57 Cal.App.5th 1088, 1092; *People v. Shaw* (2020) 56 Cal.App.5th 582, 588.)

The one-year terms the trial court imposed under section 667.5, subdivision (b), were for prior prison terms Leverette served for non-sexually violent offenses.  As the People concede, because Leverette's case was not final when the new law became effective, the new law applies to him, and the two one-year

26

enhancements under section 667.5, subdivision (b), must be stricken.  (See *People v. Shaw*, *supra*, 56 Cal.App.5th at p. 588; *People v. Hernandez* (2020) 55 Cal.App.5th 942, 947.)

## DISPOSITION

Two of Leverette's three convictions for attempted murder are reversed, and the two one-year enhancements under section 667.5, subdivision (b), are stricken.  In all other respects, the judgment is affirmed.  The trial court is directed to resentence Leverette on his remaining convictions and to send a new abstract of judgment to the Department of Corrections and Rehabilitation.


SEGAL, J.


We concur:


PERLUSS, P. J.


FEUER, J.